Citation Nr: 1761208 
Decision Date: 12/29/17 Archive Date: 01/02/18

DOCKET NO. 15-26 876 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in St. Louis, Missouri


THE ISSUES

1. Entitlement to service connection for coronary artery disease (CAD). 

2. Entitlement to service connection for sleep apnea. 

3. Entitlement to service connection for a right leg disability. 

4. Entitlement to service connection for a left leg disability. 

5. Entitlement to service connection for headaches. 

6. Entitlement to a higher rating for a depressive disorder, rated 30 percent prior to September 20, 2013, and 50 percent thereafter. 

7. Entitlement to a higher rating for a right ankle strain, rated 10 percent since September 20, 2013. 

8. Entitlement to a higher rating for postoperative (PO) residuals of a right knee replacement, rated 30 percent. 

9. Entitlement to a higher rating for a left knee disability, rated 10 percent prior to May 28, 2015, and 30 percent thereafter. 

10. Entitlement to a higher rating for a left hip disability, rated 10 percent. 

11. Entitlement to a higher initial rating for a lumbar spine disability, rated 10 percent prior to September 13, 2013 and 20 percent thereafter. 

12. Entitlement to a higher initial rating for a cervical spine disability, rated 10 percent prior to September 13, 2013 and 20 percent thereafter. 

13. Entitlement to an effective date for service connection for a lumbar spine disability prior to April 10, 2009. 

14. Entitlement to an effective date for service connection for a cervical spine disability prior to April 10, 2009. 

15. Whether the Veteran perfected a timely appeal from a May 2010 rating denying service connection for erectile dysfunction. 


ATTORNEY FOR THE BOARD

J. Fussell, Counsel




INTRODUCTION

The Veteran served in the Missouri Air National Guard from March 1977 to March 1983, and had active duty for training status (ACDUTRA) from March 1977 to June 1977. This is in accordance with a Department of Veterans Affairs (VA) Regional Office (RO) determination in a June 3, 2015 Administrative decision. 

This matter comes before the Board of Veterans' Appeals (Board) on appeal from rating decisions by the Department of Veterans Affairs (VA) Regional Office (RO) in St. Louis, Missouri. 

Historically, the Board remanded claims for service connection for low back and neck disabilities in May 2014 to afford the Veteran a hearing. He was afforded a videoconference hearing with a Veterans Law Judge (VLJ) in May 2015, following which a June 2015 Board decision granted service connection for degenerative disc disease (DDD) of the cervical spine and for DDD of the lumbar spine. 

In a July 2016 Board decision it was found that as to the claim for service connection for left shoulder disability, new and material evidence had been received within one year of a February 2013 rating decision which originally denied the service connection claim. See Bond v. Shinseki, 659 F.3d 1362, 1367-8 (Fed. Cir. 2011); Buie v. Shinseki, 24 Vet. App. 242, 251-52 (2010). As such, the claim had remained pending since that time and the Board proceeded to adjudicate the claim on a de novo basis and granted service connection for a left shoulder disability. That decision also found that prior to September 20, 2013, the criteria for a rating of at least 10 percent for right ankle disability had been met and also granted a total disability rating based on individual unemployability due to service-connected disabilities (TDIU rating). The remaining issues on appeal were remanded for additional development, including a rating in excess of 10 percent for a right ankle strain since September 20, 2013. See Murphy v. Shinseki, 26 Vet. App. 510, 514 (2014). 

A July 2016 rating decision effectuated the Board's grants, assigning a 10 percent rating for the service-connected right ankle strain from November 23, 2011, granted a TDIU rating; granted special monthly compensation (SMC) based on housebound (HB) criteria from September 20 2012, to November 1, 2013, and also granted basic eligibility to Dependents' Educational Assistance (DEA). 

On December 6, 2016 the RO issued a statement of the case (SOC) addressing ratings in excess of 20 percent for service-connected degenerative disc disease (DDD) of the cervical spine and in excess of 20 percent for service-connected lumbar DDD, as well as effective dates prior to April 10, 2009 for service connection for each of those disorders. 

Historically, a June 1, 2010 RO letter notified the Veteran of a May 2010 rating denying service connection for erectile dysfunction, to which he filed an NOD in May 2011 and, after a DRO hearing in June 2013, an SOC was issued on October 3, 2013 but his VA Form 9 was not received until January 27, 2014. On December 6, 2016 the RO issued a statement of the case (SOC) addressing whether the January 27, 2014, VA Form 9, was timely received for the purpose of perfecting his appeal from the May 2010 RO denial of service connection for erectile dysfunction. 

On file is a VA Form 9, dated December 7, 2016, and received on December 9, 2016, in which the Veteran stated he desired to appeal all of the issues "listed" on the SOC, without specifying which of the two SOCs issued on December 6, 2016 he was addressing. From the record, it appears that he intended to have the VA Form 9, perfect appeals as to all issues addressed in both SOCs issued on December 6, 2016. 

In a VA Form 9 he also indicated that he wanted a Board hearing at the local RO (otherwise known as a travel Board hearing). In subsequent VA Form 9 in April 2017 he indicated that the desired a Board videoconference. 

However, in VA Form 9, dated May 11, 2017, and entered into VBMS on May 26, 2017, he reported that he did not desire a Board hearing. 

Received with that VA Form 9 were numerous pages of correspondence, in some of which the Veteran made vague references to there being clear and unmistakable error (CUE) dating back to 1991 without specifying the exact nature of the alleged CUE or the specific rating decision. In this connection the Board notes that received on December 22, 2016 and entered into VBMS on January 3, 2017, was a copy of an RO letter to the Veteran dated April 28, 1992, informing him of a grant of service connection for residuals of a right knee injury which was assigned an initial noncompensable disability rating by reason of his failure to attend a VA examination. Moreover, by letter dated March 13, 2017, the RO notified the Veteran that it had "requested to have your CUE to be established in our systems dated December 13, 2016." This matter is drawn to the attention of the RO for clarification. 

Additional document received with the VA Form 9, dated May 11, 2017, include VA Form 21-526EZ in which the Veteran set forth a claim for SMC based on need for aid and attendance (A&). This matter is also drawn to the attention of the RO. 

Voluminous private and VA clinical records were entered into VBMS on October 17, 2017 and include a report of a private physician stating that the Veteran had had replacements of both knees and the left hip for which he should be considered for a motorized scooter. This matter is also drawn to the attention of the RO. 

In an October 24, 2017 rating the RO proposed to discontinue the TDIU rating because the Veteran had not executed and returned VA Form 21-4140, Employment Questionnaire to verify his employment status and proposed to discontinue entitlement to DEA benefits. However, now of record is VA Form 21-4140-1, Employment Questionnaire, signed by the Veteran, stating he had not been employed in the past 12 months. An October 31, 2017, rating continued both the TDIU rating and entitlement to DEA benefits. 

In correspondence in November 2017 the Veteran's wife indicated that after obtaining VA funding to close on their house, such that they would then be the owners, they planned to apply for entitlement to Specially Adapted Housing (SAH) and/or Special Home Adaptation (SHA). It was also stated that he desired to claim entitlement to special monthly compensation (SMC) based on the need for regular aid and attendance (A&A). However, effective March 24, 2015, a claimant for VA benefits must file a claim on the application form prescribed by the Secretary to be considered. See Standard Claims and Appeals Forms final action at 79 Fed.Reg. 57,660 (Sept. 25, 2014). Under 38 C.F.R. § 19.9(b) the Board shall refer to the RO for appropriate consideration and handling in the first instance all claims reasonably raised by the record that have not been initially adjudicated by the RO. Accordingly, this matter is referred to the RO for appropriate consideration. 

This appeal was processed using the Veteran's Benefits Management System (VBMS) and, in addition there is a Virtual VA paperless claims electronic file (now described as Legacy Content Manager Documents). Accordingly, any future consideration of this appeal should take into consideration the existence of these electronic records. 

This appeal has been advanced on the Board's docket pursuant to 38 C.F.R. § 20.900(c) (2017). 38 U.S.C.A. § 7107(a)(2) (West 2014).

The issue of an increased rating for a left hip disability, rated 10 percent, being remanded is addressed in the REMAND portion of the decision below and is REMANDED to the RO. 


FINDINGS OF FACT

1. A competent VA medical examiner has opined that the Veteran's service-connected disabilities have aggravated his arteriosclerotic heart disease. 

2. The Veteran has sleep disturbance due to his service-connected psychiatric disability but sleep apnea has never been diagnosed or otherwise demonstrated. 

3. The Veteran is not shown to have disability of the right or left legs independent of his already service-connected disabilities of the right ankle, right knee, the left knee, and left hip and any postservice blood clots were no more than acute and transitory and are not shown to be related to service or in any manner to a service-connected disorder. 

4. A competent VA medical examiner has opined that the Veteran's service-connected disabilities have caused his headaches. 

5. Prior to September 20, 2013, the Veteran's service-connected psychiatric disorder was productive of no more than occupational and social impairment with occasional decrease in work efficiency and intermittent periods of inability to perform occupational tasks with routine behavior and self-care. 

6. Since September 20, 2013 the Veteran's service-connected psychiatric disorder was productive of no more than occupational and social impairment with reduced reliability and productivity. 

7. The right ankle disability is manifested by painful but a noncompensable degree of limitation of dorsiflexion and plantar flexion and despite the complaints of laxity and use of an ankle support there is no clinical evidence of laxity or decreased strength. 

8. Following the Veteran's total right knee replacement he has not had ankylosis, malunion of the right tibia or fibula or limitation of extension; nor has he had extreme pain or weakness. 

9. Prior to May 28, 2015, the Veteran had a noncompensable degree of limited left knee motion but no instability or menisceal pathology. 

10. Following the Veteran's May 28, 2015, total left knee replacement he has not had ankylosis, malunion of the left tibia or fibula or limitation of extension; nor has he had extreme pain or weakness. 

11. Prior to September 13, 2013, the Veteran had painful thoracolumbar motion but did not have thoracolumbar flexion of greater than 30 degrees but not greater than 60 degrees, or a combined range of motion of the thoracolumbar spine is not greater than 120 degrees, and there were no muscle spasms or guarding severe enough to result in an abnormal gait or abnormal spinal contour such as scoliosis, reversed lordosis, or abnormal kyphosis.

12. Since September 13, 2013 the Veteran has not had thoracolumbar flexion of 30 degrees or less and has not had any ankylosis of the thoracolumbar spine or confirmed radicular symptoms of IVDS.

13. Prior to September 13, 2013 the Veteran had painful cervical spine motion but did not have cervical flexion which was greater than 15 degrees but less than 30 degrees or a combined range of motion of not greater than 170 degrees. 

14. Since September 13, 2013, the Veteran has not had limitation of cervical flexion of 15 degrees or less and he has not had any ankylosis of the cervical spine. 

15. The Veteran's original claim for service connection for disabilities of the lumbar spine and the cervical spine was received on April 10, 2009, more than one year after discharge from service, and prior thereto there was no communication which could be interpreted as expressing a desire to claim service connection or a belief in entitlement to VA disability compensation therefor. 

16. The Veteran was notified by a June 1, 2010 RO letter of a May 2010 rating denying service connection for erectile dysfunction, to which he filed an NOD in May 2011 and, after a DRO hearing in June 2013, an SOC was issued on October 3, 2013 but his VA Form 9 was not received until January 27, 2014. 


CONCLUSIONS OF LAW

1. The criteria for service connection for CAD and headaches are met. 38 U.S.C. § 101(2), (24), 1131, 5107 (2012); 38 C.F.R. §§ 3.1(d), 3.6(c), 3.303, 3.310 (2017). 

2. The criteria for service connection for sleep apnea, a right leg disability, and a left leg disability are not met. 38 U.S.C. §§ 101(2), (24), 1131, 5107 (2012); 38 C.F.R. §§ 3.1(d), 3.6(c), 3.102, 3.303, 3.310 (2017). 

3. The criteria for a higher rating for a depressive disorder, currently evaluated as 30 percent prior to September 20, 2013, and 50 percent thereafter are not met. 38 U.S.C. § 1155, 5107(b) (2012); 38 C.F.R. §§ 4.1, 4.2, 4.7, 4.130, Diagnostic Code 9434 (2017). 

4. The criteria for a higher rating for a right ankle strain, evaluated as 10 percent since September 20, 2013, are not met. 38 U.S.C. § 1155, 5107(b) (2012); 38 C.F.R. §§ 4.1, 4.2, 4.7, 4.40, 4.45, 4.59, 4.71a, Diagnostic Code 5271 (2017). 

5. The criteria for a higher rating for a right knee disability, currently evaluated as 30 percent are not met. 38 U.S.C. § 1155, 5107(b) (2012); 38 C.F.R. §§ 4.1, 4.2, 4.7, 4.40, 4.45, 4.59, 4.71a, Diagnostic Code 5055 and 5261 (2017). 

6. The criteria for a higher rating for a left knee disability, currently evaluated as 10 percent prior to May 28, 2015, and 30 percent thereafter are not met. 38 U.S.C. § 1155, 5107(b) (2012); 38 C.F.R. §§ 4.1, 4.2, 4.7, 4.40, 4.45, 4.59, 4.71a, Diagnostic Codes 5055 and 5261 (2017). 

7. The criteria for a higher initial rating for a lumbar spine disability, currently rated as 10 percent prior to September 13, 2013 and 20 percent thereafter are not met. 38 U.S.C. § 1155, 5107(b) (2012); 38 C.F.R. §§ 4.1, 4.2, 4.7, 4.40, 4.45, 4.59, 4.71a, Diagnostic Code 5242 (2017). 

8. The criteria for a higher initial rating for a cervical spine disability, currently rated as 10 percent prior to September 13, 2013 and 20 percent thereafter are not met. 38 U.S.C. § 1155, 5107(b) (2012); 38 C.F.R. §§ 4.1, 4.2, 4.7, 4.40, 4.45, 4.59, 4.71a, Diagnostic Code 5242 (2017). 

9. The criteria for an earlier effective date for service connection for a lumbar spine disability and for service connection for a cervical spine disability are not met. 38 U.S.C. §§ 5101, 5107(b), 5110 (2012); 38 C.F.R. §§ 3.102, 3.151, 3.155, 3.400, 3.401 (2017). 

10. The criteria for having timely perfected an appeal of a May 2010 rating denying service connection for erectile dysfunction have not been met. 38 U.S.C. § 7105 (2012); 38 C.F.R. § 20.200, 20.202, 20.302, 20.203 (2017). 


REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

Veterans Claims Assistance Act of 2000 (VCAA)

The VCAA imposes on VA a duty to provide notice of how to substantiate a claim and to assist in evidentiary development. VA's duty to notify was satisfied as to claims for service connection for disabilities of the cervical spine, lumbar spine, left knee and for an increased rating for service-connected knee disabilities by a May 2009 letter. See 38 U.S.C.A. §§ 5102, 5103, 5103A (West 2014); 38 C.F.R. § 3.159 (2015); see also Scott v. McDonald, 789 F.3d 1375 (Fed. Cir. 2015). As the statutory notice for the claim for service connection for disabilities of the cervical spine, lumbar spine, left knee has served its purpose, its application was no longer required as to the downstream elements of the initial rating for those disabilities as well as the effective dates for the grants of service connection for disabilities of the cervical and lumbar spinal segments. See Dingess/Hartman, 19 Vet. App. at 473, 484-86, aff'd, 483 F.3d at 1311; see also Hartman v. Nicholson, 483 F.3d 1311 (Fed. Cir. 2007); Dunlap v. Nicholson, 21 Vet. App. 112 (2007).

As to the duty to assist, of record is a September 2010 statement from J. M. W., a former employee of the National Personnel Records Center (NPRC) in St. Louis, Missouri stating that because the Veteran had related that VA informed him that they had no records of him, the employee suspected improper handling or even some destruction of some "VA service and medical records." However, that employee later informed the Veteran that his file had been located. After the employee informed his supervisor of his suspicion of the deliberate mishandling and destruction by several VA ROs of many other veterans records the employee felt he had been targeted and, in fact, his employment was terminated in August 2005. 

However, there is no official corroboration of this allegation nor are there any actual facts related which would confirm the no more than mere suspicion of the former NPRC employee. Moreover, in this case the Veteran's service treatment records (STRs) and service personnel records have been obtained and there is nothing of record which suggests that these records are incomplete. In fact, the Veteran has submitted a November 24, 2008 letter from NPRC to him informing him that his records had been loaned to VA. 

The Veteran has also referenced a record in his VA file concerning his military service which bears the name of a different veteran and, from this, had asserted that his VA records have either been tampered with, lost or are incomplete. This is an apparent reference to a March 11, 2011 "Memorandum of Record." The Veteran is correct that this Memorandum incorrectly states that it concerns another (and named) individual. However, virtually all of the other information contained in that memorandum relates to the Veteran's military service and is correct in all respects, including the Veteran's claim number. Specifically, a VA Military Records Specialist found that information from the Veteran's service personnel records established that he was on active duty from March 7, 1977 to October 15, 1977 because of an injury sustained during training. However, the records established that he had ACDUTRA from March 23, 1977, to June 30, 1977 and had no active duty, ACDUTRA or INACDUTRA from July 1, 1977 to October 14, 1977. The documents relied upon appeared to be true and unaltered copies of originals and were accompanied by a National Personnel Records Center (NPRC) cover letter to the Veteran. He had been admitted to the Hospital at Scott Air Force Base, Illinois on June 29, 1977 for an injury to his right knee he sustained getting off an aircraft. He subsequently underwent surgery on July 6, 1977 to repair the knee and was discharged from the hospital on July 15, 1977. 

Because the only incorrect information in the March 11, 2011 Memorandum is that of listing another veteran by name, rather than stating the name of this Veteran. Thus, this was clearly no more than a clerical error and in no way invalidates the correctness of the information contained in that Memorandum since all such information is consistent with the records on file. To extrapolate from this mere clerical error that the Veteran's records have in some inexplicable manner been tampered with, lost or are incomplete is not an accurate assessment. Rather, as stated, the mentioning of another veteran's name in the Memorandum was a clerical error, and no more than that. 

Moreover, of record is another "Memorandum of Record" dated March 11, 2011 which bears the Veteran's name and contains the same information as the other March 11, 2011 Memorandum of Record, listing another Veteran by name. 

The Veteran has made repeated allegations that actions of an RO had adversely affected his credit or result in identity theft, these are matters over which the Board has no jurisidiction. See 38 C.F.R. § 20.101. 

The Veteran was provided with a complete copy of his claim file on multiple occasions, including STRs, including in January 2010, April 2012, February 2013, October 2013, and February 2016. The Veteran also withdrew his request for copies of records in June 2016. 

By letter of June 3, 2014, D. Goldberg, a chiropractor reported that records of treatment of the Veteran in 1989 and 1990 for chronic low back and lower extremity injuries were no longer available. 

Medical records from the Social Security Administration (SSA) are of record, and in this regard in a January 9, 2012 Report of Contact the Veteran reported that SSA had used only VA clinical records in its' determination. Moreover, VA has obtained the Veteran's private and all of the Veteran's VA clinical records. The Veteran declined to testify in support of his claims. Also, he has been afforded VA examinations with respect to his claims. And all this was in compliance with the Board's 2016 remand. Stegall v. West, 11 Vet. App. 268 (1998). 

A transcript of the testimony of the Veteran and his wife in June 2013 before a Decision Review Officer (DRO) as to his claims for service connection for lumbar and cervical spine disorders is of record, and he was provided a copy thereof in July 2013. 

There is no allegation of any failure as to the duties to provide notice or assistance. In light of the foregoing, the Board concludes that there has been full VCAA compliance. Newhouse v. Nicholson, 497 F.3d 1298, 1302 (Fed.Cir. 2007); see also Stegall v. West, 11 Vet. App. 268 (1998). 

Establishing service connection generally requires medical or, in certain circumstances, lay evidence of (1) a current disability; (2) in-service incurrence or aggravation of a disease or injury; and (3) a link between the claimed in-service disease or injury and the present disability. See Davidson v. Shinseki, 581 F.3d 1313 (Fed. Cir. 2009); Hickson v. West, 12 Vet. App. 247, 253 (1999). However, not every manifestation of joint pain or an abnormality of heart action or heart sounds during service will permit service connection for arthritis or disease of the heart first shown as a clear-cut clinical entity at some later date. 38 C.F.R. § 3.303(b). 

When a claim for service connection is based on a period of ACDUTRA, there must be some evidence that the appellant became disabled as a result of a disease or injury incurred or aggravated in the line of duty during the period of ACDUTRA; or for INACDUTRA, there must be some evidence that the appellant became disabled as a result of an injury (not disease) incurred or aggravated in the line of duty during the period of INACDUTRA. Smith v. Shinseki, 24 Vet. App. 40, 47 (2010). In the absence of such evidence, the period of ACDUTRA or INACDUTRA would not qualify as "active military, naval, or air service," and the appellant would not qualify as a "veteran" by virtue of ACDUTRA service alone. Id.; see also 38 U.S.C. § 101(2), (24); 38 C.F.R. §§ 3.1(d), 3.6(c). 

Because the Veteran is service-connected for disability incurred or aggravated during a period of ACDUTRA, by virtue of which he is a veteran, a rebuttable presumption of service connection exists for veterans with chronic diseases specifically listed at 38 C.F.R. § 3.309(a) (and not merely diseases which are "medically chronic"), including arthritis, and cardiovascular-renal disease, if the chronicity is either shown as such service, which requires sufficient combination of manifestations for disease identification and sufficient observation to establish chronicity (as opposed to isolated findings or a mere diagnosis including the word 'chronic'), or manifests to 10 percent or more within one year of service discharge (under § 3.307). If not shown as chronic during service or if a diagnosis of chronicity is legitimately questioned, continuity of symptomatology after service is required, 38 C.F.R. § 3.303(b), but the use of continuity of symptoms is limited to only those diseases listed at 38 C.F.R. § 3.309(a) and does not apply to other disabilities which might be considered chronic from a medical standpoint. 38 U.S.C.A. §§ 1101, 1112 (West 2002); 38 C.F.R. §§ 3.303(b), 3.307(a)(3), 3.309(a). Walker v. Shinseki, 708 F.3d 1331, 1338 (Fed.Cir. 2013).

Service connection will be granted on a secondary basis for disability that is proximately due to or the result of, or permanently aggravated by, an already service-connected condition. 38 C.F.R. § 3.310(a) and (b). This requires (1) evidence of a current disability; (2) a service-connected disability; and (3) evidence establishing a nexus between the service-connected disability and the claimed disability. Wallin v. West, 11 Vet. App. 509, 512 (1998). 

Lay evidence is competent to establish the presence of observable symptoms and can establish a diagnosis when a layperson (1) is competent to identify the medical condition by its unique and readily identifiable features; or, (2) is reporting a contemporaneous medical diagnosis; or, (3) describes symptoms at the time which supports a later diagnosis by a medical professional. See Layno v. Brown, 6 Vet. App. 465, 469 (1994) and Jandreau v. Nicholson, 492 F.3d 1372, 1377 (Fed. Cir. 2007). But, a lay person is not competent to provide evidence as to complex medical questions. See Woehlaert v. Nicholson, 21 Vet. App. 456 (2007); see also 38 C.F.R. § 3.1569(a)(1) and (2) (defining, respectively, competent medical and lay evidence). Mere conclusory or generalized lay statements that an event or illness caused disability are not competent. Waters v. Shinseki, 601 F.3d 1274, 1278 (2010). Also, a credibility determination must be made as to lay evidence. See Barr v. Nicholson, 21 Vet. App. 303 (2007). After competence and credibility are determined, the probative value of all evidence is weighed. 

The Board must determine whether the weight of the evidence supports each claim or is in relative equipoise, with the appellant prevailing in either event. However, if the weight of the evidence is against the appellant's claim, the claim must be denied. 38 U.S.C.A. § 5107(b); 38 C.F.R. § 3.102; Gilbert v. Derwinski, 1 Vet. App. 49 (1990). 

Service Connection for CAD

The Veteran's STRs are negative for heart disease, and there is no clinical evidence of heart disease within the first year after his ACDUTRA ended in June 1977. 

On VA examination in November 2009 the Veteran reported that he had gained 20 pounds in the last five years because he was not able to be as physically active since his knee pain worsened. 

The Veteran was hospitalized at the St. Anthony's Medical Center in May 2010 for chest pain. A chest X-ray revealed atherosclerosis of his aorta. 

In a January 15, 2014 statement the Veteran's primary care physician, S. Cole, D.O., reported that the Veteran had coronary artery disease with evidence of prior myocardial infarction on stress echocardiogram. 

An August 5, 2015 statement from Dr. H. Hantush, the Veteran's VA Primary Care physician reflects that as to cardiac disability, he had depression secondary to service connected injuries, and he had questioned if these issues can cause his heart palpitations or irregular heartbeats. 

On January 4, 2017 a VA examiner reviewed the Veteran's records and reported that the Veteran had been diagnosed with small vessel disease in 2011. He had a well-documented cardiac history with anginal symptoms. The etiology of the small vessel disease was arteriosclerotic heart disease (ASHD). A 2014 echocardiogram had revealed inferobasal hypokinesis, indicating a questionable prior myocardial infarction (MI) of uncertain age. Exercise stress testing to determine Metabolic Equivalency Test (METs) was contraindicated because the Veteran had co-morbidities of degenerative joint disease of multiple joints preventing exercise testing. The Veteran had multiple co-morbidities which limited activities, he could traverse stairs slowly and can ride bike on level ground for 2 to 3 blocks and his estimated METS was 3 to 4 from a cardiac standpoint. 

The examiner reported that as to the Veteran's suspected small vessel disease, his service-connected conditions were not causative. However, the examiner also reported that the complex stresses regarding the diagnosis and treatment of the Veteran's service-connected conditions, specifically his disabilities of the knees, lumbosacral spine, ankle, and left hip " certainly could be aggravating factors for [the] cardiac condition - criteria for aggravation of a non-service related condition by a prior service rated condition [were] met." 

Analysis

The favorable medical opinion that service-connected disabilities have aggravated the Veteran's claimed ASHD is unrebutted. Accordingly, the criteria for service connection for ASHD are met and service connection for ASHD is warranted. 

Service Connection for sleep apnea

The Veteran's STRs are negative for signs, symptoms, complaints, history or treatment for any sleep impairment or disorder, other than that during hospitalization for right knee surgery he complained of being unable to sleep. 

On VA psychiatric outpatient evaluation in December 2009 it was reported that the Veteran had periods of initial insomnia. 

A January 2014 statement from S. Cole, D. O., reflects that she had been the Veteran's primary care source since February 2013, and he reported having a sleep disorder relating to his general medical conditions and chronic pain. 

On VA psychiatric examination on December 27, 2016 an examiner asked the Veteran to describe his sleep difficulties and he reported that he had "some extremes. I can sometimes be up for a couple days at a time and crash for 2 days." He had "no idea" what kept him up on those days when he could not sleep. 

On January 4, 2017 a VA examiner reviewed the Veteran's records and reported that the Veteran had not been diagnosed with sleep apnea. He did have a long history of sleep related issues, described including insomnia, fatigue, snoring, hypersommolance, movement issues, and altered sleep-wake periods and while there was no formal sleep evaluation of record, and no sleep study had been done, he did have persistent daytime hypersomnolence. The Veteran was advised to consult with his private medical provider. It was noted that a diagnosis of sleep apnea had not been confirmed. 

Analysis

The Veteran has indicated that he believes his condition had its onset during service. However, given the nature of the condition, the absence of relevant complaints shortly prior to service discharge, and the overall complexity of the facts of this case, the Board concludes that the Veteran is not competent to opine as to the origin of the condition. Madden v. Gober, 125 F.3d 1477, 1480-81 (Fed. Cir. 1997) (explicitly rejecting the argument that "the Board must accept a veteran's evidence at face value, and reject or discount it only on the basis of rebuttal evidence proffered by the agency" and holding that the Board must determine "the weight and probity of evidence in the light of its own inherent characteristics and its relationship to other items of evidence"). Nothing in the record shows that the causes of sleep apnea are within the ordinary knowledge a lay person. The Veteran has not demonstrated any medical knowledge, training or eexperience that would allow him to recognize such during service or identify its cause. The similarities between his current symptoms and any which he may have experienced in-service may be relevant to an expert considering potential causes of the Veteran's current condition. However, lay observation of these similarities alone is not competent evidence of causation. 

Although there is no medical opinion as to whether there was a nexus between the Veteran's service-connected depressive disorder and his claimed sleep apnea, an examiner has not been requested to render an opinion as to this matter inasmuch as there has been no such contention. Nevertheless, the Board also observes that sleep apnea is the result of pathologic changes of the airway passages. Beardsley v. Shinseki, No. 11-3455, slip op. at 1 (U.S. Vet. App. Feb. 28, 2013) (nonprecedential Memorandum decision) ("Obstructive sleep apnea" is "sleep apnea resulting from collapse or obstruction of the airway with the inhibition of muscle tone that occurs during REM [rapid eye movement] sleep."). It is not contended nor is there any evidence, lay or medical, which even remotely suggests that the Veteran's service-connected depressive disorder has caused or in any manner resulted in any pathologic changes of the Veteran's airway passages. Moreover, under the General Rating Formula for Mental Disorders, 38 C.F.R. § 4.130, chronic sleep impairment is a criterion for consideration in evaluating service connection psychiatric disabilities. Specifically, it is listed as a criterion for a 30 percent disability rating and, as such, is encompassed in the current 50 percent disability rating which has been assigned for service-connected depressive disorder. 

Thus, other than the Veteran's uncorroborated statements and testimony, which the Board finds has little probative value, there is no support for the claim that sleep apnea had its onset during the Veteran's very brief period of ACDUTRA. As to any contention that the Veteran was rendered inactive due to his service-connected low back disorder which has either caused or aggravated his now diagnosed sleep apnea, he acknowledged at the hearing that he had never been told by anyone, much less a competent medical clinician, that physical inactivity could cause or aggravate sleep apnea. Moreover, the matter of the potential cause or cause of sleep apnea and any potentially aggravating factors is one of medical complexity which requires medical training, experience, and expertise which the Veteran is lacking. Thus, the Veteran is not competent to render an opinion that lack of physical exercise, inactivity or sedentary life style caused or aggravated sleep apnea. 

Thus, the Veteran is not competent to establish that any sleep disturbance he had during his brief period of ACDUTRA, or even thereafter, was the result of sleep apnea; he has not stated that he had a contemporaneous inservice medical diagnosis of sleep apnea; and he has not described inservice symptoms, or even symptoms after service, which are supported by a postservice diagnosis or medical opinion by a medical professional. Jandreau, 492 F.3d 1372, 1377 (Fed. Cir. 2007); Layno, 6 Vet. App. 465, 469 (1994); and 38 C.F.R. § 3.159(a)(2). 

Accordingly, service connection for sleep apnea is not warranted. 

Service connection for a right and left leg disabilities

Other than a June 1977 injury to the Veteran's right medial collateral ligament of his knee which was surgically repaired during his period of ACDUTRA his STRs are negative for a disability of the right leg. 

In December 2009 the Veteran's wife, S. W., wrote that he had had neck, back, and right knee injuries during service and in about 1987 he developed additional right knee problems, and within about 4 years he began to have extensive chronic problems with his legs. 

An August 2010 VA Vocational Rehabilitation Assessment report shows that the Veteran reported that he wore a brace on his right ankle when in the community and also had a brace for his right elbow and back. He reported that he has broken his right ankle twice, and that his left leg was longer than his right, and that both feet turn inward causing pain throughout his legs. 

In September 2010 the Veteran's mother, J. W., and his pastor, J. H, wrote that he had required surgery for a right leg injury during service. 

On VA examination on January 15, 2013 the Veteran reported that with regard to his claimed right leg disability it was his right knee and right ankle that caused his symptoms, and with regard to his left leg condition it was his left hip and left knee that caused his symptoms. His knees, left hip, and right ankle were examined. 

In a January 2014 letter S. Cole, D.O., reported that the Veteran took medications for many disabilities, including knee osteoarthritis. He received regular physical therapy, chiropractic care and pain, management services related to the above conditions. He had persistent pain in his shoulders, hips, knees, and ankles. 

In a January 15, 2014 statement the Veteran's primary care physician, S. Cole, D.O., reported that the Veteran described having had chronic leg pain inhibiting his mobility since 1988. 

In a May 28, 2015 statement Dr. J. Keeney reported that the Veteran had had a left knee replacement on May 28, 2015, having previously had a right knee replacement in 2012. His condition had progressed over several years. The effect of the deterioration of his knees had had an adverse impact on the function of his hips and low back, and had exacerbated symptoms from these areas. It was expected that he would continue to have symptoms in these other areas. 

A July 29, 2016 statement from J. Keeney, M.D., of the University of Missouri School of Medicine reflects that the Veteran had had both knees replaced and continued to have some difficulties as to strength, recovery, and recurrent falls. He was diagnosed with a blood clot in his extremities about 3 to 4 months ago, which had been treated with medication which had recently been discontinued. 

Analysis

To the extent that the Veteran has reported, as he did at the January 2013 VA examination, that his claimed right leg disability is due to his service-connected right ankle and right knee disorders and that his left leg disability is due to his service-connected left knee and left hip, he is already compensated for disability stemming from these service-connected disorders. To now grant service connection for the same symptoms and same functional impairment under a general rubric of "leg" disabilities would result in double compensation, called pyramiding, which is prohibited under 38 C.F.R. § 4.14. 

Otherwise, the evidence does not show that the Veteran now has any other disability of either leg which is either of service origin or related in any manner to a service-connected disability. There is no clinical confirmation that he has leg shortening, as he has claimed, and his acute and transitory postservice episodes of blood clots in his legs, which occurred many years after service and which resolved are not shown to be related in any manner to his service-connected disabilities. Accordingly, service connection for disabilities of the right leg and the left leg is not warranted. 

Service connection for headaches

On VA examination for headaches in December 2016 the Veteran's records were reviewed. It was reported that he had been diagnosed with tension headaches. The examiner reported that the Veteran had had neck and back injuries in 1977 and had had the onset of headaches since then. He had documented neck problems and had pathology of the discs in cervical spine. The examiner opined that the Veteran's intervertebral disc disease (IVDS) was service connected and the headaches were likely secondary to IVDS of the neck. 

It was also stated that based on the Veteran's history and medical information, his headaches had their onset as a result on injury sustained to his neck area in basic training and the headaches had persisted since that time, with increasing problems being from the service connected neck intervertebral disc disease. The headaches were more likely than not related to the service connected disc disease particularly of the neck. 

Analysis

The favorable medical opinion that service-connected disabilities have caused the Veteran's claimed headaches is unrebutted. Accordingly, the criteria for service connection for headaches are met and service connection for headache is warranted. 

General Rating Principles

Disability ratings are determined by applying the criteria set forth in the VA Schedule for Rating Disabilities (Schedule), found in 38 C.F.R. Part 4. The ratings are intended to compensate, as far as can practicably be determined, the average impairment of earning capacity. 38 U.S.C.A. § 1155; 38 C.F.R. § 4.1; see Massey v. Brown, 7 Vet. App. 204, 208 (1994); Pernorio v. Derwinski, 2 Vet. App. 625, 628 (1992). In considering the severity of a disability, consideration is given to its history. 38 C.F.R. §§ 4.1, 4.2; Peyton v. Derwinski, 1 Vet. App. 282 (1991). However, the regulations do not give past medical reports precedence over current findings. Powell v. West, 13 Vet. App. 31, 34 (1999). Where entitlement to compensation has already been established and an increase in the disability rating is at issue, the present level of disability is of primary concern. Francisco v. Brown, 7 Vet. App. 55 (1994). 

A higher rating may not be denied on the basis of relief provided by medication when those effects are not specifically contemplated by the rating criteria. Jones v. Shinseki, 26 Vet. App. 56, 63 (2012) (noting that such improvement is "relevant to the appellant's overall disability picture"). Conversely, if [the applicable DC] does specifically contemplate the effects of medication, then Jones is inapplicable." McCarroll v. McDonald, 28 Vet. App. 267, 271 (2016) (en banc).

A higher rating for a depressive disorder, rated 30 percent prior to September 20, 2013, and 50 percent thereafter

Under 38 C.F.R. § 4.130, the General Formula for Rating Mental Disorders a 30 percent rating is assigned when there is occupational and social impairment with occasional decrease in work efficiency and intermittent periods of inability to perform occupational tasks (although generally functioning satisfactory, with routine behavior, self-care, and conversation normal), due to such symptoms as depressed mood; anxiety; suspiciousness; panic attacks (weekly or less often); chronic sleep impairment; or mild memory loss (such as forgetting names, directions, recent events). Id. 

A 50 percent rating is warranted where the disorder is manifested by occupational and social impairment with reduced reliability and productivity due to such symptoms as flattened affect; circumstantial, circumlocutory, or stereotyped speech; panic attacks (more than once a week); difficulty in understanding complex commands; impairment of short- and long-term memory (e.g., retention of only highly learned material, forgetting to complete tasks); impaired judgment; impaired abstract thinking; disturbances of motivation and mood; difficulty in establishing and maintaining effective work and social relationships. Id. 

A 70 percent rating is warranted where there is occupational and social impairment, with deficiencies in most areas, such as work, school, family relations, judgment, thinking or mood, due to such symptoms as: suicidal ideations; obsessional rituals that interfere with routine activities; speech intermittently illogical, obscure, or irrelevant; near continuous panic or depression affecting the ability to function independently, appropriately and effectively; impaired impulse control (such as unprovoked irritability with periods of violence); spatial disorientation; neglect of personal appearance and hygiene; difficulty in adapting to stressful circumstances (including work or a work-like setting); inability to establish and maintain effective relationships. Id. 

"[I]n the context of a 70[%] rating, [38 C.F.R.] § 4.130 requires not only the presence of certain symptoms but also that those symptoms have caused occupational and social impairment in most of the referenced areas." Vazquez-Claudio v. Shinseki, 713 F.3d 112, 117 (Fed. Cir. 2013). Thus, assessing whether a 70% evaluation is warranted requires a two-part analysis: "The . . . regulation contemplates[: (1)] initial assessment of the symptoms displayed by the veteran, and if they are of the kind enumerated in the regulation[; and (2)] an assessment of whether those symptoms result in occupational and social impairment with deficiencies in most areas." Vazquez-Claudio v. Shinseki, 713 F.3d 112, 118 (Fed. Cir. 2013). 

"Suicidal ideation appears only in the 70% evaluation criteria [] [t]here are no analogues at the lower evaluation levels." Also, "[b]oth passive and active suicidal ideation are comprised of thoughts: passive suicidal ideation entails thoughts such as wishing that you were dead, while active suicidal ideation entails thoughts of self-directed violence and death." Bankhead v. Shulkin, No. 15-2404, slip op. at 10 (U.S. Vet. App. Mar. 27, 2017) (precedential panel decision). 

Evidence of more than thought or thoughts of ending one's life to establish the symptom of suicidal ideation, is not required. In other words, a veteran need not be at a risk, whether a high or low risk, of self-harm in order to establish the criteria of suicidal ideation. "[T]he presence of suicidal ideation alone [] may cause occupational and social impairment with deficiencies in most areas." Bankhead, No. 15-2404, slip op. at 11. Also it may not be found that a claimant does not have suicidal ideation merely because he has not been hospitalized or treated on an inpatient basis, as this would impose a higher standard than the criteria in the Diagnostic Codes for mental disorders. Bankhead, slip op. at 12. 

"VA did not include in the criteria for a 70% evaluation the risk of actual self-harm. In fact, to the extent that risk of self-harm is expressly mentioned in § 4.130 at all, it is referenced in the criteria for a 100% evaluation as 'persistent danger of hurting self, a symptom VA deemed to be typically associated with total occupational and social impairment. 38 C.F.R. § 4.130." However, VA adjudicators are not "absolutely prohibited from considering [] risk of self-harm in assessing [a] level of occupational and social impairment" but there must be a differentiation between suicidal ideation, which is generally indicative of a 70% evaluation, and a risk of self-harm, the persistent danger of which is generally indicative of a 100% evaluation. Bankhead, slip op. at 12. 

A 100 percent rating is warranted when there is total occupational and social impairment, due to such symptoms as: gross impairment in thought processes or communication; persistent delusions or hallucinations; grossly inappropriate behavior; persistent danger of hurting self or others; intermittent inability to perform activities of daily living (including maintenance of minimal personal hygiene); disorientation to time or place; memory loss for names of close relatives, own occupation, or own name. Id.

The symptoms listed at 38 C.F.R. § 4.130 are not an exclusive or exhaustive list of symptomatology which may be considered for a higher rating claim. Mauerhan v. Principi, 16 Vet. App. 436 (2002). While the Veteran's symptomatology is the primary consideration, the Veteran's level of impairment must be in "most areas" applicable to the relevant percentage rating criteria. Vazquez-Claudio v. Shinseki, 713 F.3d 112 (Fed. Cir. 2013). 

The Global Assessment of Functioning (GAF) is a scaled score that mental health professionals assign upon examination of a patient reflecting the psychological, social, and occupational functioning on a hypothetical continuum of mental health illness. See Carpenter v. Brown, 8 Vet. App. 240, 242 (1995); see also Richard v. Brown, 9 Vet. App. 266, 267 (1996), citing Diagnostic and Statistical Manual of Mental Disorders (4th ed. 1994). However, a GAF score is only one factor in determining a psychiatric disability rating. Brambley v. Principi, 17 Vet. App. 20, 26 (2003).

GAF scores were part of the DSM-IV diagnostic criteria, but were removed in DSM-5. VA issued a rule which updated 38 C.F.R. § 4.125 to use of DSM-5, but only for claims pending before the AOJ on or after August 4, 2014. See 80 Fed. Reg. 14,308 (Mar. 19, 2015). Here, the claim was pending before August 4, 2014, and so GAF scores may be considered in the current adjudication. 

A GAF score of 91 to 100 indicates that that the examinee has no symptoms, superior functioning in a wide range of activities, life's problems never seem to get out of hand, is sought out by others because of his or her many positive qualities. A GAF score of 81 to 90 indicates that the examinee has no symptoms or minimal symptoms, good functioning in all areas, is interested and involved in a wide range of activities, socially effective, is generally satisfied with life, and has no more than everyday problems or concerns. A GAF score of 71 to 80 indicates that the examinee has, if any symptoms are present, symptoms which are transient or expectable reactions to psychosocial stressors but no more than slight impairment in social, occupational or school functioning. A GAF score of 61 to 70 indicates that the examinee has some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functions pretty well with some meaningful interpersonal relationships. A GAF score of 51 to 60 indicates that the examinee has moderate symptoms or moderate difficulty in social, occupational, or school functioning. A GAF score of 41 - 50 represents serious symptoms, e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting or any serious impairment in social, occupational or school functioning (e.g., no friends, unable to keep a job." Richard v. Brown, 9 Vet. App. 266, 267 (1996). A GAF score of 31 to 40 indicates that the examinee has some impairment in reality testing or communication or major impairment in several areas, such as work or school (e.g., is unable to work). A GAF score of 21 to 30 indicates that the examinee's behavior is considerably influenced by delusions or hallucinations, has serious impairment in communication or judgment, or is unable to function in almost all areas of life. 

Background

In a November 2009 statement R. C. wrote that he had known the Veteran since 1987 and was aware that the Veteran's disorders of the back and knees had resulted in depression. He had referred the Veteran to a psychologist for counseling. 

On VA psychiatric examination of May 7, 2010, the Veteran reported that pain from his service-connected knee disabilities caused stress. He endorsed several strategies to manage his pain, including using the whirlpool at the YMCA, swimming, sleeping, applying ice packs or heat, and talking with his psychologist and psychiatrist. He also took pain medications. With regard to his current symptoms of depression, he reported that he had been "sleeping a lot" and had "low energy." He stated that he was currently sleeping 14 to 15 hours per 24 hour period, and he would prefer to sleep longer. He endorsed markedly reduced interest in activities, and frequent feelings of guilt. He related having significant concentration problems, i.e., having to write everything down, increased appetite and weight gain, feeling mentally "slowed", and having a poor memory. He denied any suicidal ideation or recurrent thoughts of death. Considering CPRS records documenting recent changes in his depressive symptoms relative to his thyroid functioning and recent radio-ablation of his thyroid, it was uncertain the degree to which his current symptoms were attributable to thyroid functioning. 

As to the course of the Veteran's symptoms, he reported that he had first experienced depressive symptoms in 1987 following the onset of his knee pain. VA records showed that he was prescribed an antidepressant by his primary care provider in November 2009 due to depressive symptoms since he lost his job one year ago. Records on file appeared to substantiate the Veteran's report of longstanding depressive symptoms, including a November 2009 letter of support from Robert Coleman of Composite Resource stating that since 1987 the Veteran's physical impairments appeared to have also resulted in depression, for which he had been referred to a psychologist for counseling services. The Veteran's wife reported that she had observed the Veteran to be depressed as a result of his medical conditions. 

Currently, the Veteran denied any current auditory or visual hallucinations. He denied a history of mania, though the medical records demonstrated decreased sleep and increased energy levels due to hyperthyroidism. He denied symptoms meeting criteria for a panic attack. He denied symptoms of posttraumatic stress disorder. Records were not available to corroborate his claim of having had counseling in 1987 and 1995 for depressive symptoms. He had been prescribed anti-depressive medication in November 2009 and had been diagnosed with a depressive disorder based on symptoms of sleep disturbance, increased guilt, decreased energy, some concentration difficulties, increased appetite, and loss of sexual interest. In a December 2009 evaluation he was diagnosed with a mild to moderate major depressive disorder with a Global Assessment of Functioning (GAF) score of 68. His depressive symptoms appeared to be further complicated by treatment for hyperthyroidism. At a January 2010 endocrinology consult he was experiencing a significant reversal of his depressive symptoms, presumably related to his diagnosis of "toxic nodular thyroid." At that time, he reported that he had intentionally lost l8 lbs. in the last few months, his energy levels have been "through the roof" for the last 6 - 8 weeks, and he was only sleeping about 3 hours per night. Following thyroid radio-ablation in March 2010 it was subsequently noted that he reported an increase in depressive symptoms, including increased sleep, decreased energy, increased appetite, and depressed mood. His treating physicians questioned whether this was rebound of depressive symptoms was related to his lower thyroid levels and possible thyroid dysfunction. However, at a March 2010 psychiatry visit, the diagnosis was that his major depressive disorder was mild and in remission with a GAF score of 70. 

The Veteran had a Bachelor's degree in business and described himself as an average to above average student. He had been married 33 years, and he has 3 children. He did not talk to his children very much but still saw them because his wife spoke to them more. He reported having a good relationship with his wife, though they occasionally had conflict regarding his limited activity level. He was currently unemployed and reported that he was looking for work. He was previously employed with IBM for 6 years as a government marketing representative, then he worked for 10 years as director of operations for a non-profit agency. He spent much of his time in bed sleeping, and his wife completed most of the household chores, and as to hygiene he tried to bathe every day. 

On mental status examination the Veteran was in clean clothing, and his grooming and hygiene were good. He ambulated slowly but without assistance or prosthetic device. No fine motor impairments were observed. His mood was somewhat guarded, and his affect was generally restricted, though he did smile briefly at times during the evaluation. He paused before answering most questions, and typically looked down at his binder of VA paperwork and handwritten notes from his wife for his responses. When asked questions, he often stated quickly that he did not know the answer without considering the question. Also, he was very reluctant to choose a response to several questions on self report inventories due to apparent indecisiveness. He reported having memory impairment, and he had difficulty identifying dates and other significant details of events without referring to his binder. He was only able to recall 1 of 3 words after a brief delay. His performance improved with cues, as he recalled 3 of 3 words with semantic prompting. His thought processes were clear and no evidence of psychosis. His speech was articulate, clear, and within normal limits for volume, rate, rhythm, and prosody. Basic and sustained concentration were somewhat impaired. He responded incorrectly on 3/6 responses on a serial 7s task, often due to losing his place, indicating difficulties with complex attention. His verbal abstract reasoning skills were adequate, though somewhat concrete. Judgment and insight were fair. Despite his reports of significant pain, he appeared to be able to complete activities of daily living congruent with his age cohort, when required to do so. He reported that his wife currently managed the couple's finances. This arrangement appears to work well for them due to his reported memory impairments and depressive symptoms. He veteran appeared able to manage his VA funds through the assistance provided by his wife. 

On psychological testing the Veteran endorsed severe symptoms which when compared to his previous score on a psychiatric visit in March 2010 represented an increase in reported symptoms, and the current test results were consistent with the clinical interview and suggest that he currently met the criteria for a depressive disorder at the present time. This was consistent with his report of recurrent depressive episodes over time, since the onset of his leg pain in 1987. However, as noted, it was unclear the extent to which his current functioning was also attributable to changes in his thyroid functioning given his recent radio-ablation in March 2010. 

The assessment was that the Veteran currently endorsed moderate depressive symptoms about his physical condition, most notably his leg and back pain. With regard to his current symptoms of depression, he reported that he had been "sleeping a lot" (14 to 15 hours daily) and having "low energy.' He denied feeling particularly sad or down at the present time, but he did endorse other depressive symptoms including markedly reduced interest in activities, frequent feelings of guilt, significant concentration problems, increased appetite and weight gain, feeling mentally "slowed", and poor memory. He denied any suicidal ideation or recurrent thoughts of death. These reported symptoms were consistent with his reports, and collateral reports which documented recurrent depressive episodes lasting approximately 6 months of more beginning in 1987. It appeared that his mood symptoms began as a result of his increasing pain. He endorsed "first" feeling depressed after the onset of his leg pain in 1987, and had subsequently experienced recurrent depressive episodes. It appears more likely than not that he had experienced major depressive episodes in the past that were at least partially related to his pain/leg functioning. Currently, he reported significantly reduced social functioning as a result of his leg pain. Specifically, he indicated that he sleeps most of the day and was more irritable and isolative due to his attempts to manage his leg pain. His limited functioning had reportedly negatively impacted his relationship with his wife and children, although he continued to maintain these relationships due to the support and understanding of his family members. 

However, the examiner specifically reported that the impact of the Veteran's psychiatric symptoms was minimal compared to the impact of his leg conditions and chronic pain. Also of note, he was diagnosed with hyperthyroidism earlier this year, and he underwent radio-ablation, after which he had experienced significant fluctuations in his sleep, energy level, and mood potentially as a result of changes in his thyroid functioning. Thus, it was unclear at the present, the extent to which his current depressive symptoms were attributable to recent changes in his thyroid functioning versus poor adjustment to chronic pain. Thus, it was at least as likely as not that his current depressive symptoms were related to his service-connected leg conditions. A diagnosis of a depressive disorder, not otherwise specified (NOS), was offered in light of this uncertainty. According to the DSM-IV-TR, a diagnosis of Depressive Disorder, NOS, was given in situations when "the clinician has concluded that a depressive disorder is present, but was unable to determine whether it is primary, (or) due to a general medical condition. The final diagnosis was a depressive disorder, NOS, and a GAF score of 60, which reportedly indicated moderate impairment based on report of current depressive symptoms. 

A February 2013 statement from the Veteran's treating VA psychiatrist reflects that he had treated the Veteran since 2009 for depression and stress. He had had a course of symptoms that worsened when he was stressed, and the primary stressor in his life currently was the situation of his claims with the VA. It has come to the point that he was anxious and irritated by any interaction with the VA. He simply wanted the claim process to come to an end. His interactions with the VA caused him undue stress and affected his mood disorder. 

On VA psychiatric examination of May 29, 2013 the Veteran's only psychiatric diagnosis was a depressive disorder, not otherwise specified (NOS). There was some indication that the Veteran possessed rigid and long-standing thought patterns/beliefs that might be characterological in nature. For example, he exhibited and endorsed a preoccupation with times that he had been treated wrongly in the past. He also appeared to evaluate his own abilities more negatively than was entirely accurate, leading to his not putting forth sufficient effort, and consequently, not accomplishing tasks that he might actually be capable of. This was in evidence during the standardized mental status examination both currently and in a past primary care psychology appointment. 

The Veteran's current Global Assessment of Functioning (GAF) score was 68. His current mental health symptoms resulted in mild functional impairment. He maintained several meaningful interpersonal relationships and engaged in some enjoyable activities with his family. Further, his stated inability to work was due to his physical pain and stiffness. The best summary of his level of occupational and social impairment was occupational and social impairment due to mild or transient symptoms which decreased work efficiency and ability to perform occupational tasks only during periods of significant stress, or; symptoms controlled by medication. The examiner reported that the mental health symptoms were mild in severity and result in mild functional impairment. The veteran reported that his mood symptoms were much better since he was treated for thyroid problems, and recent mental health notes indicated that he had reported a positive shift in his mood through the use of Sertraline. 

The Veteran's VA medical records since his initial mental health examination on May 7, 2010 were reviewed. At that last mental health examination he was diagnosed with a depressive disorder, NOS at least as likely as not secondary to his service connected knee and leg conditions, and his GAF score had been 60. Since that examination he had briefly continued to meet with primary care psychology for individual psychotherapy, in 5 sessions between August 2010 and August 2011, and attended two sessions of a depression education group. At his last primary care psychology meeting, on August 9, 2011, he had complained of poor memory. A test of potential neurocognitive difficulties revealed findings that scored in the severely impaired range, but it was noted by the examining psychologist that the Veteran did not appear to put forth sufficient effort on this measure, and further observed that his scores on a brief assessment of cognitive functioning were not consistent with his reported functioning, e.g., he was able to direct himself to/from appointments appropriately, and followed up with local congress representatives on his claims process. The current examiner stated that the Veteran has also continued to meet with his psychiatrist, most recently in February 2013 at which time the diagnosis was a major depressive disorder, with a GAF score of 70. Psychiatry notes also indicated that he had experienced some improvement in his mood with the use of Sertraline, which was still included on his active medication list. 

The Veteran continued to live with his wife of over 30 years, who was his best friend. He played with his 3 grandchildren several times a week. Over the years, he had not had as good of a relationship with his 3 adult children as he would have liked. He reported spending most of his days at the YMCA, exercising and doing physical therapy because of a lot of orthopedic problems. He took some strong medications, which was monitored by his wife because he could forget that he had taken them. He related having trouble remembering things. He used a "stress ball" throughout the current examination. Taking his pain medications often led to his falling asleep, and it was difficult to even think clearly or remember stuff when on the medications. His wife worried about his memory problems. He had not worked or looked for employment since 2010. He received mental health care only through the VA. He reported that his greatest problem was his physical pain. 

Currently, a brief screening measure for neurocognitive disorders yielded a score indicative of moderate to severe dementia but the examiner stated that this did not represent an accurate measure of the Veteran's true cognitive abilities because his effort was quite poor on the task, and when he was confronted with immediate or delayed recall tasks he tended to give up quickly and on some occasions declined to try responding to the items. This was consist with findings in August 2011 examining an psychologist had noted an incongruence between the Veteran's observed and reported level of daily life functioning and his score, which was in the severely impaired range. He complained of sleeping difficulties because pain interfered with his sleep but he also complained of sleeping too much. He reported some sadness surrounding the loss of his ability to work due to his physical concerns. He flatly denied current suicidal ideation, plan, or intent, and denied past suicide attempts or psychiatric hospitalizations. 

On mental status examination the Veteran had suspiciousness but only to VA doctors and administrators. He had chronic sleep impairment, and mild memory loss, such as forgetting names, directions or recent events. He did not have a depressed mood or anxiety. He did not have any panic attacks, flattened affect, impairment of speech, or impairment of judgment or abstract thinking. He did not have difficulty in understanding complex commands, impairment in thought processes or communication, disturbances of motivation and mood, difficulty in establishing and maintaining effective work and social relationships, difficulty in adapting to stressful circumstances, including work or a work-like setting, an inability to establish and maintain effective relationships, obsession rituals which interfered with routine activities, or impaired impulse control. There was no spatial disorientation, persistent delusions or hallucinations, or grossly inappropriate behavior. The examiner reported that the Veteran had an intermittent inability to perform activities of daily living, and while his personal hygiene was maintained, the Veteran stated that he was unable to dress himself without assistance, and did not cook for fear he would forget the stove was on. If the Veteran's wife was unable to assist him, his competency to manage his financial affairs would be questioned, given his reported memory concerns. 

The examiner concluded stating that the Veteran's current mental health symptoms were mild in severity and resulted in mild functional impairment. He maintained several meaningful interpersonal relationships and engaged in some enjoyable activities with family. Further, his stated inability to work was reportedly primarily due to his physical pain and stiffness. As has been stated by the previous May 2010 examiner, the vast majority of his functional impairment, i.e., inability to participate in previously enjoyed activities, and reported inability to work, was attributable to his medical/pain concerns. His current reported mental health symptoms appeared to be somewhat improved since the May 2010 examination and he reported that his mood symptoms were much better since he had been treated for thyroid problems, and recent mental health notes indicated that he had reported a positive shift in his mood through the use of Sertraline. 

In a January 2014 letter S. Cole, D.O., reported that the Veteran took medications for many physical disabilities. He had persistent pain in his shoulders, hips, knees, ankles, neck and back contributing to stress, depression and disordered sleep. 

A February 19, 2014 Disability Benefits Questionnaire (DBQ) shows that the Veteran's claim file was reviewed and his psychiatric diagnosis was an unspecified depressive disorder. His depression had remained constant, as before. He was nervous about his set of life circumstances, having recently had a lot of medical problems, e.g., a heart attack. Pain in his back and legs impacted his mental health. His GAF score was 55. The best summary of his level of occupational and social impairment was occupational and social impairment with reduced reliability and productivity. He had not worked since May 2010. His medications included Sertraline. His wife took care of him, and his aunt. 

On mental status examination the Veteran had a depressed mood and anxiety. He had panic attacks that occurred weekly or less often. He had chronic sleep impairment, flattened affect, and disturbance of mood and motivation. He had impairment of short and long term memory, such as retention of only highly learned material, while forgetting to complete tasks. 

The Veteran did not have the following: mild memory loss, such as forgetting names, directions or recent events; or memory loss for names of close relatives, own occupation, or own name; circumstantial, circumlocutory or stereotyped speech; speech intermittently illogical, obscure, or irrelevant; difficulty in understanding complex commands; impairment of judgment or abstract thinking; gross impairment in thought processes or communication; difficulty in establishing and maintaining effective work and social relationships; difficulty in adapting to stressful circumstances, including work or a work like setting; inability to establish and maintain effective relationships; suicidal ideation; obsessional rituals which interfere with routine activities; impaired impulse control, such as unprovoked irritability with periods of violence; spatial disorientation; persistent delusions or hallucinations; grossly inappropriate behavior; persistent danger of hurting self or others; neglect of personal appearance and hygiene; intermittent inability to perform activities of daily living, including maintenance of minimal personal hygiene; or disorientation to time or place. The examiner stated that the Veteran was not capable of managing his financial affairs, because of impaired memory. 

In response to an RO proposal to find the Veteran incompetent, the Veteran submitted a letter dated March 21, 2014 from J. Behlmann, D.O., stating that he appeared to be competent and mentally capable of taking care of his financial and physical affairs. 

In an August 2014 statement a VA staff psychiatrist reported having treated the Veteran since December 2009 for major depression. He was competent to handle his finances; he had the cognitive capability to manage his own finances and VA benefits and payments; and there had not been cognitive symptoms that would prevent this. Thus, he did not need a fiduciary. 

A January 2014 statement from S. D., D. O., reflects that she had been the Veteran's primary care source since February 2013. He related having anxiety, stress, depression and a sleep disorder relating to his general medical conditions and chronic pain. 

On file are records of psychotherapy from the Community Psychological Service from 2014 through 2016. In an August 26, 2014 report from a psychologist of the Community Psychological Services it was stated that the Veteran had begun individual psychotherapy in December 2013 and requested a statement as to his competency. During treatment sessions he was well oriented, alert, and cooperative. His verbal ability suggested at least average intelligence. His speech was logical and coherent. His affect was congruent with the content of conversation. There was no indication of the presence of unusual perceptual experiences or other thought disturbances. His short and long term memory appeared intact. His attention and concentration were adequate. He was resourceful and analytical. He reported that his permanent and primary disability was related to orthopedic problems, and not psychological or cognitive difficulties. His chronic sleep difficulties and fatigue sometimes negatively impacted his mental sharpness. His chronic pain taxed his mental resources. He exhibited physiological and cognitive symptoms of depression, including mild decrements in his energy level, focus, and decision making. Nevertheless, he denied that any of these problems significantly impaired his reasoning or ability to perform activities related to the management of his personal finances. He reported that his receipt of Social Security Administration (SSA) disability benefits was due to orthopedic problems and not psychological or cognitive difficulties. He exhibited some symptoms of depression. 

A September 2014 rating decision determined that the Veteran was competent for VA purposes. 

The Veteran testified at a March 31, 2015 hearing before a Decision Review Officer that he was dealing with the pain, panic attacks, stress, depression, aggravation with the whole VA system.

In a May 4, 2015 report from the Community Psychological Service it was stated that the Veteran exhibited symptoms of moderate to severe depression, including frequent suicidal thoughts, but no intent, and significant sleep problems. He reported having mild cognitive problems including difficulties with attention, short term memory, and word finding. He also reported being withdrawn and socially isolated. In a May 7, 2015 report it was noted that the Veteran desired that VA help subsidize his private psychiatric treatment. He tended to view the VA and its administration as being obstructionist and self-interested, rather than as caring and supportive. His mistrust had been fueled by his recent reported identity theft, for which he believes the VA was partially responsible. Thus, he was not likely to approach therapy within the VA with the kind of openness and motivation that was necessary for effective treatment. He indicated that he experienced any interaction with the VA as highly stressful and he had suggested that this, by itself; motivated him to avoid unnecessary contact with VA staff. He exhibited symptoms of persistent moderate to severe depression, including frequent suicidal thoughts (but no intent), and he reported chronic medical difficulties, chronic pain, and very significant sleep problems. In a September 30, 2015 report it was noted that he reported suicidal ideation during times of acute stress. Additional reports in 2016 reflect that the Veteran had adverse interactions with VA. 

An August 5, 2015 statement from Dr. H. Hantush, the Veteran's VA Primary Care physician reflects that as to psychiatric disability, the Veteran had depression. The Veteran had been advised that his identity has been stolen through VA mail that has been mailed through the US Postal System unsealed. This situation now warranted SSA to assign him a new social security number in an attempt to catch the people who had stolen his identity and destroyed his credit. Major situations such as privacy violation had caused the Veteran stress and anxiety. 

In a September 2015 report from the Community Psychological Service it was stated that one of the Veteran's primary concerns was a perceived deterioration in his short-term memory, about which he expressed some distress and noted that he engaged in compensatory strategies, including frequent notetaking. He added that memory problems as well as possible decrements in his attention and concentration caused him some inconvenience in his daily life. He stated that ongoing, generalized pain significantly impacted his quality of life. Acute stress exacerbated his pain symptoms considerably. He reported elevated levels of physiological tension and nervousness as well as a history of panic attacks. Socially, he had a pattern of social withdrawal and isolation as well as considerable anxiety in social situations. Also, he was highly vigilant in public settings. 

In October 2015 the Veteran submitted a copy of a new Social Security Identification card reflecting that he had been assigned a new SSA identification number. 

In a September 30, 2015 report from a psychologist of the Community Psychological Services it was stated that one of the Veteran's primary concerns was a perceived deterioration of his short-term memory, and he now used compensatory strategies, e.g., note taking. This, with decrements in attention and concentration caused him some inconvenience in daily life. His chronic pain remained problematic as well, reporting that it impacted the quality of his life. Acute stress exacerbated his pain symptoms considerably. Pain and stress contributed to frequent sleep difficulties and low mood. He reported generally having elevated levels of physiological tension and nervousness, as well as a history of panic attacks. He consistently reported experiencing suicidal ideation during times of acute stress. Socially, he had a pattern of social withdrawal and isolation, as well as considerable anxiety in social situations. He was highly vigilant in public settings, finding it difficult to relax around others and communicate openly. This affected his relationships with friends and family. 

In a January 11, 2016 report from a psychologist of the Community Psychological Services it was stated that the Veteran's recent experiences with various governmental agencies had influenced his emotional well-being, physical symptoms, and increased his tendency to withdraw and isolate as coping mechanisms. This was repeated in a February 15, 2016 report from a psychologist of the Community Psychological Services. It was the psychologist's opinion that there was a strong correlation between his troubles with VA and his relationship difficulties with family members. Two themes had recurred which were (1) his mistrust of VA and particularly the VA psychological services and, (2) the interpersonal cycles that were negatively influenced by these experiences. After interactions with VA he had reported having insomnia, anxiety, physical tension, interpersonal difficulties, and depression. These had led him to withdraw from loved ones which only increased his family relationship problems. His interactions with VA probably caused him to feel agitated, fatigued, and desiring to withdraw. Also, he reported that in times of severe pain he would withdraw and isolate himself. However, advantageously, he appeared to be developing stronger coping skills. While continuing to appear sporadically, he had reported a reduction in thoughts of self-harm, suicidal ideation, and thoughts of harm to others. Therapy appeared to be gaining efficacy but continued long-term individual psychotherapy was recommended. 

An August 17, 2016 Disability Benefits Questionnaire by a private psychologist shows that the report was based on the Veteran's testimony, many military records, and his DD 214. The diagnosis was an anxiety disorder due to general medical conditions. The Veteran's GAF score was 43 and it was commented that he was highly impaired socially, relationally, and occupationally. He had a full gym set-up in his house worth thousands of dollars. He had been working out in his gym every day for years. He needed to keep working out daily, and had to keep moving otherwise his muscles and joints would lock-up. He had no social life, a strained marriage, and could not work. The best summary of his level of occupational and social impairment was total occupational and social impairment. He still saw many family members and had good relations with them all. He had very little social life because of too much pain, anxiety, worry, and very difficult financial troubles. He had been out of work since 2004 due to excessive pain and impairment. He took VA prescribed medication for pain, depression, anxiety, and stress. He did not have homicidal ideation but had frequent suicidal ideation due to severe pain, misery, and hardship. 

The Veteran's symptoms were a depressed mood; anxiety; suspiciousness; panic attacks more than once weekly; near-continuous panic or depression affecting the ability to function independently, appropriately and effectively; chronic sleep impairment; mild memory loss, e.g., forgetting names, directions or recent events; impairment of short and long-term memory, e.g., retention of only highly learned material, while forgetting to complete tasks; flattened affect; difficulty in understanding complex commands; impaired judgment; impaired abstract thinking; disturbance of motivation and mood; difficulty in establishing and maintaining effective work and social relationships; difficulty in adapting to stressful circumstances, including work or a work-like setting; suicidal ideation; obsessional rituals which interfered with routine activities; impaired impulse control, e.g., unprovoked irritability with periods of violence; persistent delusions or hallucinations; persistent danger of hurting self or others; neglect of personal appearance and hygiene; intermittent inability to perform activities of daily living, including maintenance of minimal personal hygiene; and disorientation as to time or place. 

It was noted that the Veteran had much anxiety, worry, and stress since service. He had insomnia with many awakenings, loss of sleep, irritability, and impatience. He could manage his finances but doing so was highly stressful. 

On VA psychiatric examination on December 27, 2016, the Veteran's records were reviewed and it was reported that his psychiatric diagnoses were a somatic symptom disorder with predominant pain, persistent, and severe; a depressive disorder; and a personality disorder with mixed personality features. Relevant medical diagnoses were chronic pain and mobility limitations related to various service-connected disabilities. The examiner stated that it was possible to differentiate which symptoms were attributable to each psychiatric diagnosis. 

The symptoms associated with the Veteran's somatic symptom disorder with severe and persistent pain were: excessive thoughts, feelings, and behaviors related to his somatic symptoms and associated health concerns manifested by disproportionate and persistent thoughts about the seriousness of his symptoms, persistently high level of anxiety about health and symptoms, and excessive time and energy devoted to these symptoms and health concerns. 

The symptoms associated with the Veteran's depressive disorder were: frequent depressed mood accompanied by fatigue/low energy, sleep disturbance (also attributable to physical pain), concentration difficulties, anxiety and ruminative thoughts about life circumstances and medical treatment. 

The symptoms associated with the Veteran's personality disorder with mixed personality features were: an enduring pattern of inner experience and behavior that was inflexible and pervasive which was characterized by a preoccupation with times that he had been treated wrongly in the past. As noted at the previous examination, the Veteran also appeared to evaluate his own abilities more negatively than was entirely accurate, leading to his not putting forth sufficient effort, and consequently, not accomplishing tasks that he might actually be capable of. He also exhibited a tendency to be overly suspicious of the motives and actions of others (particularly VA providers). 

The Veteran's level of occupational and social impairment with regards to all mental diagnoses was best summarized as occupational and social impairment with reduced reliability and productivity. However, while the examiner noted that symptoms of the several psychiatric diagnoses could be separated, it was stated that it was not possible to differentiate what portion of the stated occupational and social impairment was caused by each mental disorder. The rationale was that while it was possible to parcel out which symptoms are related to each assigned diagnosis, the differential impact of each diagnosis on the Veteran's functioning could not be determined without resorting to mere speculation. The diagnostic profile was complex, and various symptoms overlapped substantially. Also, symptoms of all disorders served to interact with and exacerbate one another. Thus, all of the above symptoms negatively impacted his functioning, and it was impossible to pull apart what portions of functional impairment were due to each symptom. 

As to the Veteran's functioning since his 2013 VA psychiatric examination, he and his wife continued to live together, having been married about 40 years. He stated that their relationship was "strained by [his] dysfunctions" because he was not intimate, he was irritable, had memory problems and did not communicate well. He was sometimes up "a couple of days at a time" and it drove her up a wall, but at times he would "crash" for several days. The Veteran's wife agreed with his summary of his concerns and with his statement that these issues led to a strained marriage. He stated that his children and grandchildren, a number of whom he saw weekly, were important to him but that he was distant from them because of his problems. He went to therapy weekly. As to daily activities, he reported that most of his life was absorbed with keeping journals on his 15,000 hours of dealing with VA, including identity theft. He had had two knee replacements and a shoulder repair. He expected to receive a left hip replacement next year. He reported that discussing his financial situation and his physical health concerns led to anxiety and emotional discomfort. 

As to relationships outside of his family, the Veteran stated that he used to have friends. As to enjoyable activities, he reported that he liked to read and liked to swim all the time. He has not worked outside of his home since his 2013 VA psychiatric examination, and had not worked in 9 to 10 years. He sometimes assisted other veterans in filing VA claims. He had been receiving some informal training from a local veterans service organization when he felt up to it. The examiner observed that, having also conducted the 2013 VA psychiatric examination of the Veteran, it had been noted at that time that the Veteran had some characterological traits which served to further impair his functioning outside of the influence of the depressive disorder alone. The examiner summarized the Veteran's mental health treatment since the 2013 VA examination. The Veteran reported that he was now attended psychotherapy services with civilian psychologist, Dr. P. Monrow, who was a former marine. 

The Veteran reported having sleeping problems and that his health and sleeping affected his mood. He had headaches and pain in many bodily areas. As to sleep difficulties and he reported that he had extremes, sometimes being up for a couple days at a time and then crashing for 2 days. His daytime energy was variable and his concentration was a problem. He related that his long-term memory was good but his short-term memory was impaired and that he had to write things down. The examiner noted that the Veteran declined to participate in a brief screening for the presence of neurocognitive concerns. The Veteran reported that he had an obsessive-compulsive disorder (OCD) because he kept repeating himself and did some things over and over. 

The examiner noted that the Veteran was guarded throughout the interview, even declining to answer whether he was currently having any thoughts of suicide or thoughts of harming himself. However, he indicated that at the time of the examination he did not intend to harm himself. He denied current homicidal ideation, plan, or intent. At no time during examination did he make any suicidal or homicidal statements. Rather, he appeared to be future-oriented in his thinking and committed to maintaining his health for as long as possible, as evidenced by his discussion of the importance of providing for his wife, of regularly attending medical appointments, and carefully following medical advice. The Veteran denied drug and alcohol abuse. 

The examiner reported that the Veteran had symptoms of a depressed mood; anxiety; chronic sleep impairment; mild memory loss, such as forgetting names, directions or recent events; disturbances of motivation and mood; and difficulty in establishing and maintaining effective work and social relationships. Other psychiatric symptoms were those previously listed as to each of the Veteran's three psychiatric diagnoses. 

The examiner reported that the addition of the psychiatric diagnosis of somatic symptom disorder to the diagnostic profile represented a progression of the previously diagnosed depressive disorder, not otherwise specified (NOS) which was equivalent to the diagnosis of Other Specified Depressive Disorder. That is, based upon record review and the current clinical interview, the emotional impact of the Veteran's ongoing physical health concerns and the limitations that they impose had increased in severity since the last exam. Further, the Veteran's preoccupation with these difficulties had also increased. He currently met the diagnostic criteria for both somatic symptom disorder and other specified depressive disorder. 

The addition of the diagnosis of other specified personality disorder represented a correction of the previous diagnostic profile. That is, the current examiner noted at the time of the 2013 psychiatric examination that the Veteran exhibited some characterological traits which seemed to lead to further distress and functional impairment over and above that imposed by the diagnosis of Depressive Disorder; however, given the absence of a previous personality disorder diagnosis in the Veteran's medical record, and the brief nature of the psychiatric examination in 2013, no personality disorder diagnosis was assigned at that time. Further records from the Community Psychological Service reflected a treating diagnosis of other specified personality disorder, and traits noted by the Veteran's providers at that agency were consistent with those observed by the current VA examiner at the prior, 2013, examination. As such, the presence of a personality disorder diagnosis was considered to be confirmed. 

Of record is a VA psychologist's report later in December 2016 which was made after a review of the Veteran's records. A query posed was whether the diagnosis of an anxiety disorder due to general medical conditions was a progression of the service-connected depressive disorder. The VA psychologist opined that the diagnosis of an anxiety disorder due to general medical conditions had been made in error. The rationale was that the essential feature of an anxiety disorder due to another medical condition was clinically significant anxiety that was judged to be best explained by a physiological effect of another medical condition (DSM-5). Per DSM-5, a number of medical conditions were known to include anxiety as a symptomatic manifestation. Numerous examples were set forth. Anxiety due to another medical condition was diagnosed when the medical condition was known to induce anxiety and when the medical condition preceded the onset of the anxiety. 

The Veteran's listed medical conditions reported in the August 2016 DBQ report were "spinal and knee injury." Clinical literature did not support a direct pathophysiological effect of orthopedic conditions causing anxiety. The private sector psychologist reported in the August 2016 DBQ evaluation report that the Veteran had total social and occupational impairment. However, that private psychologist had reported "yes" for almost all listed symptoms, including psychotic symptoms, thought disorder, impulse control problems, suicidal ideation and obsessional rituals. The opining VA psychologist stated, however, that it was worth noting that none of these symptoms were evidenced across the Veteran's treatment records (CPRS) or his most recent VA psychiatric examination in December 2016. 

A thorough review of all VA psychiatry notes did not reveal any concerns for thought disorder, psychotic symptoms, impulse control problems, suicidal ideation or obsessional rituals. The VA psychologist stated that the opinion of the private psychologist expressed in the August 2016 DBQ report was not an accurate reflection of the Veteran's mental health symptoms. The August 2016 private psychologist's DBQ examination report documented that the Veteran was concerned about being deemed incompetent to handle his VA disability compensation but documented that he was competent. The VA psychologist specifically stated that all treatment notes were inconsistent with the severity of symptoms as stated in the August 2016 private psychologist's DBQ examination report. 

Analysis

Depressive Disorder Rated 30 percent Prior to September 20, 2013

In this case the Veteran's has had some fluctuation of his depression and his sleeping pattern which, as speculated by clinicians, might be due at least in part to the Veteran's nonservice-connected thyroid dysfunction and treatment therefor. Because clinicians have not been able to separate how much of the Veteran's impairment is due to his service-connected psychiatric disorder and how much is due to his nonservice-connected thyroid dysfunction and treatment therefor, the Board will consider all impairment of his depression and his sleeping pattern as being due to his service-connected psychiatric disorder for rating purposes. 

For the period prior to September 20, 2013, the Board initially notes that the Veteran did not have any GAF scores above 70 and that other than an isolated GAF score of 60, indicating moderate impairment, most of his GAF score were between 61 and 70, indicating no more than moderate impairment. In fact, the conclusions of the 2010 and May 2013 VA examiners were that he had only mild overall impairment. In this regard, the Veteran has at times endorsed severe symptomatology, and particularly in regards to his memory. On the other hand, the May 2013 examiner noted that the Veteran had not made a full effort in testing of his cognitive functioning and that his responses on such testing were not in keeping with his reported functioning, as had also been found on testing in August 2011. Moreover, the May 2013 examiner noted that the Veteran had continued to have several meaningful interpersonal relationships and engaged in some enjoyable activities with his family; and, that most of the Veteran's impairment stemmed from his concerns with pain and his physical health. 

The Board is aware that the Veteran had repeatedly complained of having difficulties stemming from his interactions with VA but also of the possibility that at least some of this may be characterological in nature. Nevertheless, prior to September 2013 the evidence did not show that the Veteran had 
circumstantial, circumlocutory, or stereotyped speech; panic attacks, objectively verifiable impairment of short- and long-term memory, impaired judgment; impaired abstract thinking; or significant difficulty in establishing and maintaining effective work and social relationships. 

Accordingly, the preponderance of the evidence is against finding that at any time prior to September 20, 2013, an evaluation in excess of 30 percent was warranted for the Veteran's service-connected psychiatric disorder. 


Depressive Disorder Rated 30 percent Since September 20, 2013

Initially, the Board notes that the August 2016 DBQ report by a private clinician reflects a host of symptoms not elsewhere clinically confirmed in the record. That clinical report stated that the Veteran had total social and occupational impairment and listed such symptoms obsessional rituals, impaired impulse control, e.g., unprovoked irritability with periods of violence. However, that examiner described no behaviors relative to obsessional rituals or impaired impulse control or periods of violence. As noted by a later evaluation in December 2016 by a VA psychologist, the August 2016 DBQ by a private clinician reported the existence of almost all possible symptoms listed in the DBQ form. The Board notes that this included persistent delusions or hallucinations and that there is virtually no other evidence of record to corroborate that the Veteran has ever had such symptoms. Essentially, this was also indicated by the VA psychologist in December 2016. Accordingly, the Board gives little probative value to the report of the August 2016 DBQ by a private clinician, including the GAF score of 43, at that time which would otherwise indicate serious symptomatology. 

The most recent VA psychiatric examination found that the Veteran had not only a service-connected depressive disorder but also a personality disorder as well as a somatic disorder. While the symptoms of each could be parsed out, the levels or degrees to which each contributed to overall impairment could not be distinguished. The recent VA examiner pointedly observed that the symptoms of these disorders interacted with and exacerbated each other. Thus, for rating purposes, the Board will not attempt to separate the degrees to which each of these disorders contributes to the Veteran's overall level of social and occupational impairment. 

The Veteran has continued to report significant impairment of his memory to his private treating sources. In fact, the record shows that has continued to relate having to take extensive notes as reminders. However, private psychological testing in August 2014 noted that his short and long term memory appeared intact and his attention and concentration were adequate. At the December 2016 VA psychiatric examination the Veteran renewed his complaint of impaired short term memory, and having to takes notes. However, that VA examiner specifically reported that the Veteran declined to participate in screening for the presence of his neurocognitive concerns. The conclusion at that time was that he had only mild memory loss. Given the Veteran's continued failure to cooperate with respect to his repeated complaints of short term memory impairment, the Board can give no credence to these complaints. 

There is evidence that the Veteran has had suicidal ideation, which would be consistent with a 70 percent disability rating. However, discounting the August 2016 DBQ report from a private clinician, for the reasons previously stated, there is no evidence of obsessional rituals that interfere with routine activities. His speech has not been intermittently illogical, obscure, or irrelevant. He has not had near continuous panic or depression affecting the ability to function independently, appropriately and effectively. Also, he has not had impaired impulse control, e.g., unprovoked irritability with periods of violence). Moreover, he has not been shown to have spatial disorientation; neglect of personal appearance and hygiene; or an inability to establish and maintain effective relationships. Rather, his GAF score of 55 in February 2014 is consistent with moderate overall impairment which is encompassed by a disability rating of no more than 50 percent. At that time he had a flattened affect and such impairment of memory that highly learned material was retained, all of which is consistent with no more than a 50 percent rating. 

Accordingly, the preponderance of the evidence is against finding that at any time since September 20, 2013, an evaluation in excess of 50 percent was warranted for the Veteran's service-connected psychiatric disorder.

Musculoskeletal Impairment

When evaluating joint disabilities rated on the basis of limitation of motion, consideration is given to functional loss due to pain, weakness, excess fatigability, or incoordination, factors not contemplated in the relevant rating criteria. See 38 C.F.R. §§ 4.40, 4.45, 4.59; DeLuca v. Brown, 8 Vet. App. 202 (1995). Although pain may be a cause or manifestation of functional loss, limitation of motion due to pain is not necessarily rated at the same level as functional loss where motion is impeded. See Mitchell v. Shinseki, 25 Vet. App. 32 (2011). Thus, functional loss caused by pain must be rated at the same level as if the functional loss were caused by any of the other factors cited above. See id. In evaluating the severity of a joint disability, VA must determine the overall functional impairment due to these factors. Read together, DC 5003 and 38 C.F.R. § 4.59 provide that painful motion due to degenerative arthritis that is established by x-ray is deemed to be limitation of motion and warrants the minimum compensable rating for the joint, even if there is no actual limitation of motion. Lichtenfels v. Derwinski; 1 Vet. App. 484, 488 (1991). The provisions of 38 C.F.R. § 4.59 relating to painful motion are not limited to arthritis and must be considered when raised by the claimant or when reasonably raised by the record. Burton v. Shinseki, 25 Vet. App. 1 (2011).

Disability of the musculoskeletal system is primarily the inability, due to damage or infection in parts of the system, to perform the normal working movements of the body with normal excursion, strength, speed, coordination and endurance. Functional loss may be due to the absence or deformity of structures or other pathology, or it may be due to pain, supported by adequate pathology and evidenced by the visible behavior in undertaking the motion. Weakness is as important as limitation of motion, and a part that becomes painful on use must be regarded as seriously disabled. 38 C.F.R. §§ 4.40, 5.59. In Mitchell v. Shinseki, 25 Vet. App. 32 (2011), the Court held that, although pain may cause a functional loss, "pain itself does not rise to the level of functional loss as contemplated by VA regulations applicable to the musculoskeletal system." Rather, pain may result in functional loss, but only if it limits the ability "to perform the normal working movements of the body with normal excursion, strength, speed, coordination, or endurance." Id., quoting 38 C.F.R. § 4.40. Actually painful, unstable or malaligned joints warrant at least a minimum compensable rating. 

Evidence of pain, weakened movement, excess fatigability, or incoordination must be considered in determining the level of associated functional loss in light of 38 C.F.R. § 4.40, taking into account any part of the musculoskeletal system that becomes painful on use. DeLuca v. Brown, 8 Vet. App. 202 (1995). The provisions regarding the avoidance of pyramiding do not forbid consideration of a higher rating based on greater limitation of motion due to pain on use, including flare ups. 38 C.F.R. § 4.14. 

A higher rating for a right ankle strain, rated 10 percent since September 20, 2013

With the foot at a 90 degree angle to the ankle as the neutral or starting position, normal (full) range of ankle motion is defined as follows: from 0 degrees to 20 degrees of dorsiflexion and from 0 degrees to 45 degrees of plantar flexion. 38 C.F.R. § 4.71, Plate II. 

Under 38 C.F.R. § 4.71a, DC 5271 limitation of motion of an ankle warrants a 10 percent rating when moderate and 20 percent when marked. 

While the schedule of ratings does not provide any information as to what manifestations constitute "moderate" or "marked" limitation of ankle motion, guidance can be found in VBA's M21-1 Adjudication Procedures Manual. Specifically, the M21-1 states that moderate limitation of ankle motion is present when there is less than 15 degrees dorsiflexion or less than 30 degrees plantar flexion, while marked limitation of motion is demonstrated when there is less than 5 degrees dorsiflexion or less than 10 degrees plantar flexion. See VBA Manual M21-1, III.iv.4.A.3.k. In August 2017 VA published proposed changes to the evaluation of certain musculoskeletal disabilities to incorporate these provisions in the M21-1. See 82 Fed.Reg. 35719 (August 1, 2017) (noting that VA currently uses these standards to define marked and moderate, this change is intended as a clarification of current policy.") See 82 Fed.Reg. 35719, 35723 (August 1, 2017). 

Under 38 C.F.R. § 5272, ankylosis of the subastragalar or tarsal joint in a good weight-bearing position warrants a 10 percent rating and when in poor weight-bearing position a 20 percent rating is warranted. Under 38 C.F.R. § 5273, malunion of the os calcis or the astragalus with moderate deformity warrants a 10 percent rating and 20 percent is warranted if the deformity is marked. Under 38 C.F.R. § 5274, a 20 percent rating is warranted for residuals of an astragalectomy. 

Right Ankle Strain

On VA examination on January 15, 2013 the Veteran reported that he began using a cane in 1990 because of his right knee and had used it most of the time since then. 

As to the Veteran's right ankle a June 2010 VAOPT record showed that the Veteran had 10 degrees of right ankle eversion, 20 degrees of inversion at the hindfoot with no pain on dorsiflexion of that ankle. X-rays were said to show minimal degenerative changes with a well appearing joint space, and the assessment had been right ankle instability, for which a brace was recommended and strengthening encouraged. The Veteran related that he had the onset of right ankle pain 15 years ago and that his right ankle had been weak for 20 years, and he had frequently twisted the right ankle, because of which he now wore a neoprene support. His activities of daily living of standing and walking were restricted because of symptoms involving the knees, and the left hip, not specifically because of his right ankle. 

On physical examination the Veteran stood with normal alignment of the right ankle and foot, bilaterally. There was normal alignment to the tendo-Achilles, the long axis of the tibia, and normal alignment of the hindfoot. Right ankle dorsiflexion was to 20 degrees, there was 40 degrees of plantar flexion, 30 degrees of inversion, 20 degrees of eversion, and with the same ranges of motion in the left ankle. Muscle strength of ankle dorsiflexor, plantar flexors, invertors and everters was 5/5, bilaterally. After repetitive motion, there was no change in motion. There were no findings of pain, fatigability, weakness, lack of endurance or incoordination of the right ankle or the left. Ligament testing of the right ankle did not demonstrate any varus, valgus, anterior or posterior laxity. There was no soft tissue swelling about the right ankle. There was no localized tenderness about the right ankle. The examiner had to assist the Veteran in removing his shoes, socks and elastic ankle support and also put them back on. 

X-rays in May 2010 were reviewed and disclosed that in both the right and left ankles there was calcification distal to the medial malleolus. This finding was likely an accessory ossification center in the area of the medial malleolus since the medial malleolus was not tender on either ankle, and there were minimal symptoms in the left ankle. The right ankle showed calcaneal spurring at the point of attachment of plantar fascia to the os calcis and small calcification area of the attachment of tendo-Achil1e's to the calcaneus, posteriorly. There was no evidence of osteoarthritis of the ankle joint nor in the subtalar joint, and the findings were similar in the left ankle. 

The diagnosis was a right ankle strain. It was opined that it was at least as likely as not that the Veteran's right ankle condition was secondary to an altered gait and increased biomechanical stresses upon the right ankle due to the service-connected right knee. 

In a January 2014 letter S. Cole, D.O., reported that the Veteran took medications for many disabilities and received regular physical therapy, chiropractic care and pain, management services. He had persistent pain in his joints, including the ankles. 

A February 12, 2014 Disability Benefits Questionnaire (DBQ) report shows that the Veteran's claim file was reviewed and that as to the Veteran's ankles he had degenerative arthritis, bilaterally. He had had multiple breaks to both ankles all of which occurred after his military service. He had constant pain in both ankles at this time. He had back problems which caused problems with his ambulation. He did not report that flare-ups impacted the function of the ankle. 

On physical examination right ankle plantar flexion was to 40 degrees, with pain beginning at 35 degrees. Dorsiflexion was to 20 degrees, with pain beginning at 15 degrees. After three repetitions of motion plantar flexion was to 40 degrees and dorsiflexion was to 20 degrees, and it was reported that he did not have additionally limited motion after repetitive-use testing. He had functional loss due to limited and painful motion, and weakened movement. There was no pain on palpation. Strength was normal in both planes of right ankle motion. There was no laxity on anterior Drawer's test but there was on talar tilt test (inversion/eversion stress). He had not had right ankle surgery. He constantly used a cane and regularly used a walker. It was reported that his ankle condition did not impact his ability to work. It was remarked that he had no additional limitation of motion due to pain during flare-ups or when joint was used repeatedly over a period of time. According to claims file, he had degenerative arthritis in ankles and his condition appeared to be worsening. 

On VA examination on January 4, 2017 the Veteran's records were reviewed. It was reported that the Veteran had traumatic arthritis of the right ankle. His past clinical history was reported and he had not had right ankle surgery. The Veteran complained of pain and stiffness which were worst with weight-bearing, prolonged ambulation, and cold weather. He reported having functional impairment and flare-ups which caused the above noted symptoms and swelling and which often required rest and elevation. When acutely symptomatic, weight bearing and ambulation were negatively affected. 

On physical examination right ankle dorsiflexion, actively and passively, was to 10 degrees and plantar flexion was to 25 degrees. The examiner noted that there was pain in plantar flexion but that it did not cause functional loss. There was no pain with weight-bearing or on palpation and no evidence of crepitus. Strength was normal in dorsiflexion and plantar flexion. There was no atrophy and no additional loss of function or range of motion after three repetitions of motion. The examiner stated that pain, fatigue, weakness, and lack of endurance caused functional loss. Ankle instability was suspected but ligamentous testing revealed no laxity. The right ankle was tender to palpation. It was reported that the Veteran regularly used braces as an ambulatory aid. With respect to occupational impairment the examiner reported that activities requiring prolonged weight bearing or ambulation would be problematic. 

Right Ankle Analysis

Repeated testing of the Veteran's range of motion of the right ankle has shown that he has never had a compensable degree of limitation of motion in dorsiflexion or plantar flexion, and this was true after tests of repeated motion on examinations in January 2013 and February 2014. However, the February 2014 examination found that he had pain beginning at 15 degrees of dorsiflexion. 

The Veteran has reported having had laxity, or instability, of the right ankle requiring his use of support but this has not been clinically confirmed upon repeated testing of ligamentous laxity on VA examinations in 2013, 2014, and 2017. Similarly, there has been no clinical finding of diminished strength, even though the 2014 examination reported that there was functional loss due to weakened movement, as well as painful motion. Moreover, while at that time the examiner found that the right ankle condition did not impact the Veteran's ability to work, the more recent examination in 2017 found occupational impairment due to problems with prolonged weight bearing or ambulation, particularly when acutely symptomatic, i.e., during flare-ups. However, he otherwise had no pain during weight bearing but he did have functional loss due to pain, fatigue, and lack of endurance. 

The Veteran has not had ankylosis of the right ankle, malunion of the os calcis or residuals of an astragalectomy, which would warrant a higher rating under DCs 5272, 5273, or 5274. 

While the Veteran does not have a compensable degree of limitation of motion of the right ankle in either dorsiflexion or plantar flexion, the current 10 percent rating encompasses his having pain on motion, as well as his difficulties during prolonged weight bearing and ambulation. Given the lack of clinical findings of diminished strength or actual ligamentous laxity in the right ankle, his clinical picture does not more closely approximate the level of impairment comparable to marked limitation of motion of the right ankle. 

Thus, since September 20, 2013, the preponderance of the evidence is against finding that the right ankle disability more closely approximated the criteria for a rating in excess of 10 percent. 

Knees

STRs show that due to an incomplete tear of the right medial collateral ligament, in June 1977 the Veteran had a repair reefing of that ligament with associated Slocum tendon transfer and arthrotomy, following which he was in a long leg cast for 6 weeks. In October 1977 it was reported that he still had some residual laxity and was undergoing a rehabilitative exercise program but still had significant disability. 

VA X-rays of the left knee in November 2009 revealed moderate degenerative arthritis of the patellofemoral joint. X-rays at that time of the right knee revealed and old healed fracture deformity of the lateral tibial plateau, secondary degenerative arthritis of the medial and lateral compartments, and severe degenerative arthritis of the right patellofemoral joint. In that same month he was fitted for a right knee brace. 

In a November 2009 statement R. C. wrote that he had known the Veteran since 1987 and had seen the Veteran bent over and barely able to walk, which the Veteran stated was due to his service-connected disorders. 

On VA examination of November 23, 2009 it was reported that the Veteran had had a repair and reefing of the right medial collateral ligament with associated Slocum tendon transfer and arthrotomy in 1977. He was placed in a long-legged, nonweight-bearing cast after surgery for several months and was followed by Physical Therapy. He began having problems with right knee pain in approximately 1987 without any history of reinjury of the knee since service. He stated that the right knee symptoms had progressively worsened. The knee had become unstable, which was his main concern. He had fallen about four times a year, despite wearing an elastic knee brace. 

The Veteran reported that he now had constant pain around the kneecap and medial joint of the right knee that was described as a severe ache, varying in severity from 5-6/10 and 10/10. It was worsened by walking more than one-quarter mile and by cold weather changes. He reported occasional episodes of severe pain in the distal, right anterior thigh as well. The right knee popped when he walked. It would swell occasionally but there was no redness or increased warmth. It had locked up twice this year. It felt unstable and had given way. He wore an elastic knee brace on most days, especially for increased weight-bearing activity. He used a cane on most days. He treated his knee pain in the past with Aleve, three tablets, two or three times a day. 

The Veteran had had an aspiration in the late 1980s or early l990s when his knee initially began becoming problematic, but had had none since then. He had not had steroid injections to the knee. He had no further surgery to the knee since leaving the military. He had been unable to pass the physical for a commercial driver's license for the last seven years because of his increasing knee problems. He was unable to work out or swim as much because of the increasing knee problems. He found it too difficult to get in and out of the bathtub and could only take showers now. He also had to use an assistive tool to help get shoes on and off. He had pain and difficulty moving the right leg fast enough to go back and forth between the brake and gas pedal when driving. He could no longer drive a stick shift car because of the frequent use of the knees required for that. 

As to the Veteran's left knee, he reported that he began having symptoms in the left knee in the late l980s or early 1990s without any history of trauma to the left knee. His wife had mentioned that he was walking with a limp favoring the right knee, transferring more weight to the left leg at that time. He reported frequent, episodic, throbbing, and aching pain in the lateral patellofemoral joint of the left knee that came and went on a daily basis. The pain was present whenever and as long as he was weight-bearing. It was brought on by twisting movements, as well as the weight-bearing activity, and was alleviated by resting. The severity varied between 5-6/10 for a minor flare-up and 9-10/10 for a severe flare-up. He treated the pain with icepacks, which helped, as did medication. He used a left elastic knee brace for any increased weight-bearing activity but did not use a cane. The left knee swelled occasionally and popped frequently. It had locked once in the past year and the left knee felt unstable. It gave way occasionally, less often than the right knee, but he stated it had given way twice in the past year. He had not had aspiration procedures or injections to the left knee. He stated that the impact on activities of daily living, driving, and daily recreational and social activities was the same as that caused by his right knee. 

As to his right knee, on physical examination the Veteran walked with a mild limp, favoring the right lower extremity. He had an increased wear pattern on the sole of the left shoe, compared with the right shoe. The right knee had a curvilinear, longitudinal, surgical scar wrapping around the medial patellofemoral joint, ending at the tibial tubercle. This was an S-shaped scar measuring 19 cm in length. There was a small, V-shaped, second scar that joined it at the distal end over the anterior tibial tubercle, measuring 2.5 cm in length. These were all linear scars, nontender, freely mobile with the surrounding skin with no evidence of keloid formation, ulceration or depression. The proximal 2 cm of the longer scar over the distal medial femoral condyle had a mild degree of atrophy within the scar. It was hypopigmented. There was mild tenderness to palpation over the medial patellofemoral joint, but no effusion, redness or increased warmth. There was marked crepitation of the patella with normal tracking. Range of motion of the right knee was 0 - 120 degrees actively, with pain at that end point, diminishing to 112 degrees with repetition due to increasing pain. Passive range of motion of the right knee was 0 - 128 degrees with pain at that end point. There was no evidence of any further limitation due to pain, weakness, stiffness or fatigability on repetitive testing. Anterior and posterior drawer signs were negative. There was no varus or valgus instability at 0 and 30 degrees. Murrays test was negative. There was no genu varum or valgum on standing, but the Veteran was noted to shift his weight toward the left lower extremity when standing. 

On physical examination of the Veteran's left knee there were no surgical scars, redness, increased warmth or effusion. There was mild tenderness to palpation over the lateral patellofemoral joint. There was moderate crepitation of the patella with normal tracking. Range of motion was 0 - 130 degrees actively and 134 degrees passively with complaints of pain at those end points. There was no evidence of further limitation due to pain, weakness, stiffness or fatigability on repetitive testing. Anterior and posterior drawer signs were negative. There was no varus or valgus instability at 0 or 30 degrees. Murrays test was negative. There was no genu varum or valgum on standing. His gait was noted to have a more pronounced right lower extremity limp at the conclusion of the visit. He was not using a cane for ambulation. He was not wearing any type of knee bracing at the time of the examination. 

Right knee X-rays revealed an old healed fracture deformity of the lateral tibial plateau; secondary degenerative arthritis, medial and lateral compartments; and severe degenerative arthritis of the patellofemoral joint. Left knee X-rays revealed moderate degenerative arthritis of the patellofemoral joint. The diagnoses were severe posttraumatic degenerative arthritis of the right knee, status post surgical repair of the torn medial collateral ligament; and moderately severe degenerative arthritis of the left knee. It was opined that the left knee degenerative arthritis was related to the right knee condition. 

An August 2010 VA Vocational Rehabilitation Assessment report shows that the Veteran reported that he wore a brace on his right ankle when in the community and also had a brace for his right elbow and back. He reported that he has broken his right ankle twice, and that his left leg was longer than his right, and that both feet turn inward causing pain throughout his legs. 

On VA examination on September 17, 2010 the Veteran reported having arthritic changes and constant pain in both knees. In the right knee the pain was 8 on a scale of 1 to 10 and in the left knee pain is 7 on a scale of 1 to 10. He stated that both knees were weak, stiff, and lacked endurance. He did not report deformity, instability, giving way, locking, effusion or episodes of dislocation or subluxation. He did not report any symptoms and signs of acute inflammation such as heat, redness, tenderness or drainage. He had received Synvisc injections in each knee periodically and also took VA prescribed medication for pain. He did not report having any additional flare-ups. 

The Veteran used an orthopedic knee brace on the right knee and an over-the-counter knee brace on the left knee. He used a cane to walk. There was no history of recent hospitalizations or surgeries. He reported that his bilateral knee conditions affected his activities of daily living secondary to pain. He reported that he could walk for half a block and he could stand for seven minutes. He had worked for the St. Louis Housing Authority 10 years ago. After that, he had been self employed buying and selling properties, but that he had been unable to work for four years. 

On physical examination, while sitting in the chair, the Veteran's right knee was at 90 degrees. When asked to bend the knee further he stated that he could not go further than that, but he did not try. It was noted that an orthopedist had recorded range of motion of 130/140 of flexion on June 30, 2010, and flexion of the left knee had been 130/140, with extension of each knee is to 0 degrees. There was no objective evidence of pain at rest or pain with range of motions. Pain was reported subjectively. There is no objective evidence of edema, effusion, instability, tenderness, redness, heat, abnormal movement, guarding of movement, deformity, malalignment or drainage. He walked slowly with a cane. There is no skin breakdown, callosities or unusual shoe wear pattern on either side because of the knees. There was no ankylosis. There was no loss of joint function with use on account of pain, weakness, fatigue, lack of endurance or incoordination. 

X-rays in June 2010 had revealed moderate degenerative joint disease in the right knee and mild osteoarthritic changes in the left knee. More recent X-rays were not now needed. The diagnoses were moderate osteoarthritis of the right knee and mild osteoarthritis of the left knee. 

On September 20, 2012, at a private medical facility, the Veteran underwent a total right knee replacement. 

A September 21, 2012 statement from Dr. J. Keeney of the Washington University School of Medicine reflects that following the total right knee replacement the Veteran would need physical therapy for 3 to 6 months to reduce pain and improve function. 

On VA examination on January 15, 2013 the Veteran reported that with regard to his claimed right leg disability it was his right knee and right ankle that caused his symptoms, and with regard to his left leg condition it was his left hip and left knee that caused his symptoms. He stated that he began using a cane in 1990 because of his right knee and had used it most of the time since then. He would vary the use of the cane from either the right hand, if his left hip was hurting, or his left hand if his right knee was hurting more. 

The Veteran was still undergoing postoperative exercises after his right knee replacement. Prior to that surgery his right knee would give way, and he had severe pain. Since that surgery he continued to have right knee pain but much less pain, and still had a sensation that the right knee would give way due to weakness. His left knee had been painful but never to the degree of the right knee. He was limited in his activities at the present time because of symptoms regarding his left hip as well as the postoperative status for his right knee. He was able to stand for only about 4 to 5 minutes. He could walk only about half a block. After sitting 20 minutes he developed stiffness in his right knee and left knee. He did exercises with a bicycle every 2 days. His symptoms of his knees were not characterized by having flare-ups. 

On physical examination the Veteran wore bilateral customized knee braces. With removal of the knee braces, he was able to walk but only with a cane. He stood with both knees in normal alignment, i. e, without varus or valgus deformities. He walked in a rather stiff-legged manner with his cane. He was not asked to squat. 

As to range of motion, postoperatively the Veteran's right knee extension was full, to 0 degrees, and flexion was to 115 degrees with no pain. Left knee extension was full to 0 degrees, and flexion was to 130 degree's with only mild knee pain beginning at 100 degrees flexion and extending to 130 degrees. There was no change in motion with repetition. Quadriceps and hamstrings strength on the left was 3/5, on the right quadriceps and hamstring strength was 4/5. After repetitive motion, there was mild pain in each knee, fatigability more so in the left knee than the right with weakness more so in the left knee than the right and lack of endurance, more so in the left knee than the right but no incoordination. There was bilateral moderate bilateral patellofemoral crepitus. The right knee demonstrated a curved anteromedial 24 cms. scar (this type of incision was more likely than not used rather than the standard straight anterior incision because the Veteran already had an anteromedial incision from his prior surgery in 1977. There was only slight diffuse anterior right knee tenderness, with no tenderness of the left knee. 

Thigh circumferences was 41 cms. right, and 42 cms. on the left with 1 cm. of atrophy of the right thigh. Calf circumferences were 35.5 cms. on the right, and 34 cms. on the left due to soft tissue swelling of a mild degree of the right calf. Knee circumferences were 39 cms. on the right, and 37.5 cms on the left due to soft tissue thickening following the total right knee replacement. There was no joint effusion of the left knee but there was 1+ joint effusion of the right knee. There was slight atrophy of the right thigh secondary to the right knee condition. 

Patellar alignment and tracking were normal with no subluxation. Ligament testing of each knee was done and both knees were stable. There was no varus or valgus laxity. There was negative Lachman's test, and no pivot shift in the loft knee (this was not attempted on the right knee following his right knee replacement. There were negative Drawer signs. 

The diagnoses were osteoarthritis of the right knee, status post total right knee arthroplasty, and osteoarthritis of the left knee. 

In a January 2014 letter S. Cole, D.O., reported that the Veteran took medications for many disabilities, including knee osteoarthritis. He received regular physical therapy, chiropractic care and pain, management services related to the above conditions. He had persistent pain in his knees contributing to stress, depression and disordered sleep. 

A February 12, 2014 Disability Benefits Questionnaire (DBQ) report shows that the Veteran's claim file was reviewed. He had degenerative arthritis of the left knee and a right knee replacement, followed by much physical therapy. He did not report that flare-ups impacted the function of the knees. 

On physical examination right knee flexion was to 140 degrees, with pain beginning at 130 degrees. Extension was full and painless to 0 degrees, with no change in range of motion after repetitive use testing but there was functional loss or impairment due to painful motion. Left knee flexion was to 140 degrees, with pain beginning at 130 degrees. Extension was full and painless to 0 degrees, with no change in range of motion after repetitive use testing but there was functional loss or impairment due to painful motion. There was no tenderness or pain to palpation for joint line or soft tissues of either knee. Strength was 4/5 in flexion and extension of each knee. There was no ligamentous instability or patellar subluxation of either knee. 

It was reported that following his October 1, 2012 right knee replacement he had intermediate degrees of residual weakness, pain or limitation of motion. His postoperative right knee scarring was not painful or unstable. He constantly used a cane and regularly used a walker. He used a cane most all the time to ambulate but used a walker to walk further distances. 

Records dated May 15, 2015 from Dr. J. Keeney show that the Veteran was happy with the results of his right knee replacement and was looking forward to having his left knee replaced. He had pain of the medial and lateral aspects of the left knee, which he been refractory to treatments of activity modification, medications, rehabilitation exercises, and intra-articular injections. A left knee MRI indicated focal articular cartilage loss in the posterior aspect of the lateral and medial femoral condyles. He presented for consideration of replacement of the left knee. On examination he had a mildly antalgic gait pattern, favoring his left lower extremity. The left knee was stable to varus and valgus stress. He had good range of motion from 0 to 120 degrees. He had moderate patellofemoral crepitance, and discomfort was increased with patellofemoral compression. He had moderate lateral and medial joint line tenderness. Quadriceps strength was 5/5. X-rays did not demonstrate significant articular cartilage loss or advanced degenerative findings. The impression was symptomatic left knee pain, arthritis, and chondrosis. The severity of his pain somewhat exceeded expectations from radiographic appearance, as was the case with the right knee. He had significant pain that was interfering with ambulation and his ability to perform daily activities of living. X-rays had revealed advanced knee osteoarthritis as evidenced by loss of cartilage documented by an MRI. 

The Veteran underwent a total left knee replacement on May 28, 2015. The operative report reflects that he had had left knee pain with osteoarthritis that limited activities. Conservative treatments had failed. 

In a May 28, 2015 statement Dr. J. Keeney reported that the Veteran had had a left knee replacement on May 28, 2015, having previously had a right knee replacement in 2012. His condition had progressed over several years. The effect of the deterioration of his knees had had an adverse impact on the function of his hips and low back, and had exacerbated symptoms from these areas. It was expected that he would continue to have symptoms in these other areas. 

An August 5, 2015 statement from Dr. H. Hantush, the Veteran's VA Primary Care physician reflects that as to his left knee the Veteran had had various treatments and pain management injections. He had had left knee replacement surgery on May 28, 2015, and was recovering and it appeared the surgery was successful. He was still having some problems with his knees and left hip. He utilized his walking stick, knee and un-load support braces as needed to continue therapy. His left knee was weak and unstable due to degenerative arthritis of right, knees and legs. 

A February 26, 2016, record from Dr. Keeney shows that on follow-up of the left knee replacement the Veteran was proceeding reasonably well. The Veteran reported that he had been told by another physician that he needed to have his rehabilitation process extended by an additional 3 months, beyond the initial 13 months through VA healthcare. On examination he ambulated with a stable gait pattern. Bilateral range of motion of the knees was from 0 to 120 degrees. He had mild varus/valgus mobility which was within acceptable parameters for total knee replacements. There was a mild click with this which the Veteran described as "catching" in his knees. Quadriceps strength was 5-/5 and he was able to stand independently from a seated position. X-rays revealed acceptable positioning of both total knee replacements, without evidence of loosening or other complications. The assessment was that he was stable following his bilateral total knee replacements. 

Left knee X-rays by VA on May 8, 2016, status post total knee arthroplasty, revealed that the hardware was unchanged in position. There was a moderate amount of suprapate11ar joint effusion present. Significant enthesopathy of the patella was present both superiorly and inferiorly. There were several osseous fragments which projected over the joint space on the lateral view. The impressions were that there was no displaced fracture but there was swelling but with the orthopedic hardware unchanged in position from prior examination; and suprapatellar joint effusion, which might indicate internal joint injury. 

A July 29, 2016 statement from J. Keeney, M.D., of the University of Missouri School of Medicine reflects that the Veteran had had both knees replaced and continued to have some difficulties as to strength, recovery, and recurrent falls. He reported falls over the last month. He felt that he could not rely on his knees for support. On physical examination he was able to stand from a seated position. He had a slow and deliberate gait. He demonstrated signs consistent with antalgia. He had flexion to 120 degrees and full extension of both knees. Knee strength was more lax in flexion than extension, but with good overall stability. Quadriceps strength was 5-/5. On distal neurovascular examination he was intact. Left knee X-rays in May 2016 revealed an acceptably aligned total left knee arthroplasty component without evidence of acute complication. The impression was that the Veteran was clinically stable following bilateral knee replacements. He still had significant reported functional difficulties with activity and concerns about balance, strength, and a history of falls. 

On VA examination of December 6, 2016, of the Veteran's knees his records were reviewed. It was noted that he had had a total right knee replacement in 2012. He had had VA orthopedic care for several years including bracing, physical therapy, 2014 Synvisc joint injections for severe right knee, and left knee arthritis. Since the Veteran's last VA rating examination of his left knee in February 2014 he had had a total left knee replacement in May 2015. 

Records of VA care in 2016 included the most recent left knee X-ray in May 2016 which revealed good prosthetics position and small suprapatellar effusion. A single orthopedic visit in September 2016 showed that he complained of recurrent left knee swelling and pain still, but on examination there was no effusion, stable ligaments, mild pain with good range of motion from 0 to 130 degrees and there was no specific therapy or orthopedic follow-up plan. In November 2016 he had been referred by his primary physician for left knee physical therapy again; and that November 2016 physical therapy examiner recorded a history of the Veteran's activity which still included swimming and cycling both 3 days a week, and a plan to start quadriceps strengthening and a home exercise program (HEP). 

The Veteran reported that he had not returned to any YMCA swimming in the last 3 to 4 weeks. He was unable to walk more than 1/2 block now, his goal being to get back to walking 1 to2 blocks or use an exercise bike or street ride his bike again. He was still functional for activities of daily living at home. He used a wheeled bench to do light flower gardening. He lived in a walk-out lower level of their home so he rarely used stairs (due to both knees, also low back and left hip). He indicated that his left hip would likely need replacement in the next 2 to 3 months. He was to discuss this more at January 2017 pre-operative visit. He could stand for only less than 10 minutes due to all of his pains. He used a scooter in large stores. He drove locally, and was then limited by back pain. 

As to his knees, the Veteran reported he had constant daily pain in both knees, but worse in the left knee for the last several months with swelling several days a week. He reported that only his left knee had given out and caused a fall, last August 2016, down the stairs at home and for which he was evaluated at a VA emergency room and it had been found that he had no serious injury. Only his left knee had locked, and only rarely and after sitting for a long time. He also reported that then his left hip felt locked up simultaneously, both with marked pain. He wore braces on both knees 5 to 6 days a week. Only on the left knee did he use a hinged brace, and on the right knee he used a pull-on heavy tubular brace. He reported having daily crepitus in each knee. He stated that until 2001 he had worked full-time as a home inspector, but quit due to worsening problems with his knees. From 2001 to 2003 he had worked part-time at a Brewery, supervising housekeeping staff, but was let go because his knees and low back caused him to miss too much time from work. He had not had any employment since then. 

The Veteran did not report having flare-ups but reported having functional loss or functional impairment, as described above. On physical examination he had full extension of each knee to 0 degrees and flexion was to 120 degrees. The restricted motion contributed to functional loss in that he was unable to flex his knees enough to touch the floor, even when supporting himself with his cane or holding a table edge, due to pain in both knees. Both knees hurt when ascending the single step of the examination table even holding edges to assist himself. He had pain on flexion of each, and there was evidence of pain in each knee on weight-bearing. There was mild pain and tenderness on manipulation of both patellae in a relaxed supine position in full knee extension. There was palpable crepitus of both knees but no subluxations. There was tenderness of the right quadriceps tendon and both patellar margins. There was tenderness on the left at the lateral patellar and lateral tibiofemoral joint areas and quadriceps tendon. There was no guarding. Only in the left knee was there definite bit a small amount of pre and infrapatellar small effusion, but no warmth or erythema. In each knee he able to perform repetitive use testing with at least three repetitions and without additional loss of function or range of motion. The examiner was unable to state, without resorting to speculation, whether pain, weakness, fatigability or incoordination significantly limited functional ability with repeated use over a period of time. 
Strength in each knee in flexion and extension was normal and there was no muscle atrophy. There was a history of recurrent subluxation in the left knee but not of lateral instability but on testing there was no instability of the left knee, and testing of stability of the right knee was not indicated. Following his September 2012 right knee replacement he had had an intermediate degree of residual weakness, pain or limitation of motion in each knee. Following his May 2015 left knee replacement he had had both intermediate degrees of residual weakness, pain or limitation of motion and chronic residuals consisting of severe painful motion or weakness. 

As to other pertinent physical findings the Veteran arose from the waiting room chair by pushing off with both arms. He walked with a left-handed cane, erect but mildly wide-based gait and no lateralizing antalgia, no ataxia or evident pain distress. He was able to sit during the interview without posturing his lower extremities or low back. He removed his shoes while seated, at which time he flexed at waist while his feet remained on floor. When walking on his heels he had adequate strength but was reluctant to attempt walking even with a cane or holding table edge, complaining of both low back and bilateral ankle pain, but no pain in his knees. Romberg was negative but he was unable to tandem walk due to unsteadiness. There was no varus or valgus deformities knees. 

The examiner noted that the examination of the right knee was incomplete and had been done only to provide comparison data of range of motion and function in both weight bearing and non-weight bearing. The PO left knee scar was length 14 cms. in length and 0.5 cms. in width. The scar was mobile, flat, nontender, and without underlying fibrosis. He regularly used braces and a cane to walk. He wore a hinged Velcro brace on the left knee and a heavy pull-on open patella brace on the right knee, with padded lateral margins. 

The examiner noted that the Veteran did not report having flare-ups affecting his joint function. Thus, it was not possible to state, without resorting to speculation, whether pain, weakness, fatigability or incoordination could significantly limited functional ability during flare-ups or to specify degrees range of motion loss. Also, with further "Repetitive Use over a period of time" the joint function might or might not develop "additional limitation due to pain, weakness, fatigability or incoordination. The Veteran's history did not enable the examiner to state, without resorting to speculation, the degrees of additional range of motion loss, if any, which might occur then. Where possible, the examiner had employed both active and passive assessments of range of motion for both involved and uninvolved joints. Also, where possible, both involved and uninvolved joints were assessed with both weight-bearing and non-weight-bearing testing, and painful responses were recorded. Also, there was evidence of pain on passive range of motion and pain when the joint was used in non-weight bearing, but it was noted that the opposing joint, i.e., the right knee, was not undamaged. 

A February 1, 2017 statement from J. Keeney, M.D., shows that the Veteran reported having catching and popping around the left hip, associated with pain. He had had an injection in the left hip about 6 months ago which provided relief for 3 to 4 months, and he was scheduled for another injection in about 2 weeks. He did not have present complaints about his knees. On examination he had well healed incisions around both knees. There was no appreciable effusion. He had good range of motion, bilaterally, from 0 to 120 degrees. He had 110 degrees of left hip flexion. He ambulated with a stable gait pattern without an assistive device. The impression was left hip pain with a suspected acetabular labral tear and an MRI was recommended to verify this. His bilateral knee replacements were functioning reasonably well and his overall pain was substantially better than before his surgery. 

A March 2, 2017 statement from J. Keeney, M.D., shows that the Veteran complained of significant left hip pain, and he reported having catching and pinching sensations in that hip which had caused his leg to give way, resulting in falls. His left hip pain was significantly interfering with his ability to ambulate and function. 


Knee Rating Criteria

Where there is recurrent subluxation, lateral instability, or other impairment of a knee, a 10 percent evaluation may be assigned where the disability is slight, a 20 percent evaluation will be assigned for moderate disability, and 30 percent for severe disability. 38 C.F.R. 38 C.F.R. § 4.71a, DC 5257. 

Also, under 38 C.F.R. § 4.71a, DC 5258, a 20 percent evaluation, the highest and only rating available under that schedular provision, may be assigned where there is evidence of dislocated cartilage, with frequent episodes of "locking," pain, and effusion into the knee joint. 

Under 38 C.F.R. § 4.71a, DC 5259 symptomatic residuals of removal of a semilunar cartilage warrants a maximum rating of 10 percent. 

Under 38 C.F.R. § 4.71a, DC 5260 a 10 percent rating requires flexion be limited to no more than 45 degrees. A 20 percent rating is assigned when flexion is limited to no more than 30 degrees, and 30 percent is assigned when flexion is to no more than 15 degrees. 

Under 38 C.F.R. § 4.71a, DC 5261 a 10 percent rating requires extension be limited to no more than 10 degrees, a 20 percent rating to no more than 15 degrees, a 30 percent rating to no more than 20 degrees, a 40 percent rating to no more than 30 degrees, and a 50 percent rating to no more than 45 degrees.

Under 38 C.F.R. § 4.71, DC 5262 impairment of the tibia and fibula with malunion and slight knee or ankle disability warrants a 10 percent rating; when moderate a 20 percent rating is warranted; and with marked knee or ankle disability a 30 percent rating is warranted; with nonunion and loose motion requiring a brace, a maximum 40 percent is warranted. 

Under 38 C.F.R. § 4.71, DC 5263 acquired genu recurvatum with weakness and instability in weight-bearing objectively demonstrated, a maximum 10 percent rating is warranted. 

Under 38 C.F.R. § 4.71a, DC 5055 a 100 percent total rating is assigned for 1 year following implantation of a prosthesis. Thereafter, a minimum 30 percent rating is assigned. With intermediate degrees of residual weakness, pain or limitation of motion, a rating is assigned analogously under DCs 5256 (ankylosis), 5261 (limitation of extension), or 5262 (tibial or fibular impairment). With chronic residuals consisting of severe painful motion or weakness in the affected extremity a 60 percent rating is warranted. 

Diseased joints may be manifested by crepitation on motion in the tendons or ligaments, or within join structures. 38 C.F.R. § 4.40. Pain, swelling, locking and crepitus may be compensated under the DCs for limited motion, i. e., DCs 5260 and 5261. Lyles v. Shulkin, No. 16-0994, slip op. at 14 (U.S. Vet.App. Nov. 29, 2017) (acknowledging popping and grinding as symptoms of crepitus and that to the extent that crepitus or locking cause disturbance of locomotion, sitting, standing, and weight-bearing they are contemplated under § 4.45(f)). 

A higher rating for a right knee disability, rated 30 percent

Upon being granted service connection for right knee disability, the Veteran was assigned a 100 percent temporary total rating due to a right knee replacement on September 20, 2012, and upon the expiration thereof a minimum schedular 30 percent rating was assigned under Diagnostic Code 5505 from November 1, 2013. 

Since the Veteran's right knee replacement the evidence is clear that he has not had ankylosis, or symptoms or findings comparable or analogous to ankylosis of that knee. Thus, a higher rating not warranted under DC 5256. Similarly, for a higher rating under DC 5262 there would have to be nonunion or at least loose motion requiring a brace and the record shows that the Veteran does not have symptoms or findings comparable or analogous to be nonunion or loose motion requiring a brace. Thus, a higher rating not warranted under DC 5262. 

For a higher rating under DC 5261, limitation of extension, there would have to be limitation of extension to 30 degrees. However, the evidence does not show that the Veteran any limitation of extension, or other finding in conjunction with limitation of motion, which are comparable or analogous to limitation of extension to 30 degrees. 

Moreover, the Board notes that the post-prosthesis findings do not demonstrate that the Veteran has any unacceptable instability of the prosthesis which would hypothetically warrant a rating based on instability under DC 5257. Moreover, in light of the prosthesis he no longer has any knee cartilage which could cause pathologic symptoms hypothetically warranting a disability rating under DCs 5258 or 5259 for dislocated semilunar cartilage or symptomatic removal of semilunar cartilage. 

Further, the evidence fails to demonstrate that the Veteran has had severe painful motion of the right knee or severe weakness of the right leg which would warrant a 60 percent disability rating under DC 5055. 

Accordingly, the Board finds that the preponderance of the evidence is against concluding that a disability rating in excess of 30 percent is warranted for the Veteran's postoperative right knee replacement. 

A higher rating for a left knee disability, rated 10 percent prior to May 28, 2015, and 30 percent thereafter

Upon the grant of service connection for left knee disability, an initial 10 percent disability rating was assigned but from May 28, 2015 he was assigned a 100 percent rating including for the period after his left knee replacement, and upon the expiration thereof a minimum schedular 30 percent rating was assigned under Diagnostic Code 5505, effective July 1, 2016. 

Here, the November 2009 VA examination found that the Veteran had a noncompensable degree of limitation of motion in flexion and extension, but a 10 percent rating was warranted based on the Veteran's report of pain at the ends of motion. He had crepitation and even complained of locking. However, these symptoms are compensated for a minimally compensable rating for painful motion. While he complained of the left knee feeling unstable, on examination there was no instability. The Board finds that the diagnosis of joint instability is not within the ability of a lay person to diagnose because a competent medical expert cannot diagnose the Veteran based on reported symptoms alone and requires specialized testing beyond ordinary clinical evaluation. Mattke v. Deschamps, 374 F.3d 667, 670 (8th Cir. 2004) (a diagnosis by laboratory testing is distinctly not within the realm of common lay knowledge). The Veteran has not contended, nor does the evidence show, that he has the medical expertise required to conduct or interpret such tests. Thus, the Board finds that the Veteran's contention that he has instability of the left knee is not a valid lay diagnosis. Accordingly, the Board finds that the Veteran is not entitled to a disability rating under DC 5257. 

Similarly, on VA examination in September 2010 the Veteran had a noncompensable degree of limitation of flexion and had full left knee extension, and even no pain of motion. While the Veteran had purchased a left knee brace, there was no objective evidence of effusion, instability, tenderness, redness, abnormal movement, guarding of movement, deformity or malalignment. Also, on examination in 2013 there was a noncompensable degree of limitation of flexion and had full left knee extension, and while he had crepitus, clinical tests were negative for ligamentous laxity and there was no evidence of menisceal pathology. The February 2014 DBQ examination report also shows that he had a noncompensable degree of limitation of flexion and had full left knee extension, and there was no ligamentous instability. In fact, on examination on May 15, 2015, only a few days before his left knee replacement he had full left knee extension and flexion was to 120 degrees and X-rays revealed no cartilage loss. 

Thus, the Board finds that prior to May 28, 2015, the preponderance of the evidence is against finding that a disability rating in excess of 10 percent for left knee disability was warranted. 


A Rating in Excess of 30 percent for PO Residuals of a Left Knee Replacement Since July 1, 2016

Since the Veteran's left knee replacement the evidence is clear that he has not had ankylosis, or symptoms or findings comparable or analogous to ankylosis of that knee. Thus, a higher rating not warranted under DC 5256. Similarly, for a higher rating under DC 5262 there would have to be nonunion or at least loose motion requiring a brace and the record shows that the Veteran does not have symptoms or findings comparable or analogous to be nonunion or loose motion requiring a brace. Thus, a higher rating not warranted under DC 5262. 

For a higher rating under DC 5261, limitation of extension, there would have to be limitation of extension to 30 degrees. However, the evidence does not show that the Veteran any limitation of extension, or other finding in conjunction with limitation of motion, which are comparable or analogous to limitation of extension to 30 degrees. 

Moreover, the Board notes that the post-prosthesis findings do not demonstrate that the Veteran has any unacceptable instability of the prosthesis which would hypothetically warrant a rating based on instability under DC 5257. Moreover, in light of the prosthesis he no longer has any knee cartilage which could cause pathologic symptoms hypothetically warranting a disability rating under DCs 5258 or 5259 for dislocated semilunar cartilage or symptomatic removal of semilunar cartilage. 

Further, the evidence fails to demonstrate that the Veteran has had severe painful motion of the left knee or severe weakness of the left leg which would warrant a 60 percent disability rating under DC 5055. 

Accordingly, the Board finds that the preponderance of the evidence is against concluding that a disability rating in excess of 30 percent is warranted for the Veteran's postoperative left knee replacement. 


Spinal Rating Criteria

Under the criteria for rating intervertebral disc syndrome (IVDS), at 38 C.F.R. § 4.71a, DC 5293, the pertinent considerations are (1) incapacitating episodes (defined in Note 1 as a period of acute signs and symptoms due to IVDS that requires bed rest prescribed by and treatment by a physician) during the immediately preceding 12 months and, if so, the total duration of them, or (2) the combination of the neurologic and orthopedic manifestations of the disability under 38 C.F.R. § 4.25. Whichever method results in the higher evaluation must be used. 

As to incapacitating IVDS episodes in the past 12 months, if they have a total duration of at least 1 week but less than 2 weeks, a 10 percent evaluation is warranted; if they have a total duration of at least 2 weeks but less than 4 weeks, a 20 percent evaluation is warranted; if they have a total duration of at least 4 weeks but less than 6 weeks, a 40 percent evaluation is warranted; if they have a total duration of at least 6 weeks during the past 12 months, a 60 percent evaluation is warranted. 

Supplementary Information in the published final regulations states that treatment by a physician would not require a visit to a physician's office or hospital but would include telephone consultation with a physician. If there are no records of the need for bed rest and treatment, by regulation, there are no incapacitating episodes. 67 Fed. Reg. 54345, 54347 (August 22, 2002). 

VAOGCPREC 36-97 (Dec. 12, 1997) provided that in rating IVDS under DC 5293, 38 C.F.R. §§ 4.40 (functional loss may be due to pain) and 4.45 (pain on motion is a factor in joint disability) must be considered because nerve defects and pain may limit spinal motion, even if the current rating were to correspond to the maximum rating (under pre-September 26, 2003, criteria) for limited spinal motion. 


Spinal Orthopedic Manifestations

The General Rating Formula for Diseases and Injuries of the Spine created by the revised spinal rating criteria uses objective criteria and other pertinent considerations with or without symptoms such as pain (radiating or not), stiffness, or aching and, thus, encompass and take into account these symptoms and removes any requirement that there be such symptoms to assign any evaluation. 68 Fed. Reg. at 51454 - 51455 (August 27, 2003). Note 2 sets forth maximum ranges of motion for the spinal segments, except that a lesser degree of motion may be considered normal (if the cause is explained as required in Note 3) and Note 4 states that range of motion should be measured to the nearest five degrees. 

Thoracolumbar Spine Criteria

Note (6) to the thoracolumbar rating criteria provides that the thoracolumbar and cervical segments of the spine are to be separately evaluated except when there is unfavorable ankylosis of both segments which will then be rated as a single disability. 

Note 2 to the General Rating Formula provides that normal forward flexion of the thoracolumbar spine is to 90 degrees, extension is to 30 degrees, left and right lateral flexion as well as left and right lateral rotation are to 30 degrees. The combined range of motion refers to the sum of these ranges of motion and the normal combined range of motion of the thoracolumbar spine is 240 degrees. The normal ranges of motion for each component of spinal motion provided in this note are the maximum that can be used for calculation of the combined range of motion. 

A 10 percent rating is warranted when forward flexion of the thoracolumbar spine is greater than 60 degrees but not greater than 85 degrees or the combined range of motion of the thoracolumbar spine is greater than 120 degrees but not greater than 235 degrees (the maximum combined range of motion being 240 degrees), or if there is either (1) muscle spasm, guarding, or localized tenderness not resulting in abnormal gait or abnormal spinal contour; or, (2) vertebral body fracture with loss of 50 percent or more of body height. 

Under the general rating formula, a 20 percent rating is warranted when forward flexion of the thoracolumbar spine is greater than 30 degrees but not greater than 60 degrees, or the combined range of motion of the thoracolumbar spine is not greater than 120 degrees, or where there is muscle spasm or guarding severe enough to result in an abnormal gait or abnormal spinal contour such as scoliosis, reversed lordosis, or abnormal kyphosis. A 40 percent evaluation is warranted where forward flexion of the thoracolumbar spine is to 30 degrees or less, or there is favorable ankylosis of the entire thoracolumbar spine. A 50 percent evaluation is provided for unfavorable ankylosis of the entire thoracolumbar spine and a 100 percent rating is warranted for ankylosis of the entire spine.

A 40 percent rating is warranted when forward flexion of the thoracolumbar spine is 30 degrees or less; or, there is favorable ankylosis of the entire thoracolumbar spine. A 50 percent rating is warranted when there is unfavorable ankylosis of the entire thoracolumbar spine. A 100 percent rating is warranted when there is unfavorable ankylosis of the entire spine. 

Normal ranges of motion of the thoracolumbar spine include: Flexion from 0 to 90 degrees; extension from 0 to 30 degrees; lateral flexion bilaterally from 0 to 30 degrees; and rotation bilaterally from 0 to 30 degrees. 38 C.F.R. § 4.71a, Plate V. 

In a claim for an increased rating for a service-connected spinal disability, the Board may adjudicate whether a separate compensable rating is warranted for neurological disability from the radicular component without the RO having first addressed entitlement to secondary service connection for such radicular component. This is because the Board does not lack jurisdiction over issues that were not explicitly discussed by the RO if the issues are related to the matter on appeal; rather, "[o]nce the Board has jurisdiction over a claim, ... it has the authority to address all issues related to that claim, even those not previously decided by the RO." Jarrell v. Nicholson, 20 Vet. App. 326, 332 (2006) (en banc) (emphasis added); see also Bernard v. Brown, 4 Vet. App. 384 (1993). 

Under 38 C.F.R. § 4.124a, the schedules for rating diseases of the cranial and peripheral nerves include alternate DCs for paralysis, neuritis, and neuralgia of each nerve. See 38 C.F.R. § 4.124a, DCs 8205 to 8730. The DCs for paralysis of a nerve allow for multiple levels of incomplete paralysis, as well as complete paralysis. However, the ratings available for neuritis and neuralgia of the same nerves can be limited to less than the maximum ratings available for paralysis. In rating peripheral neuropathy attention is given to sensory or motor impairment as well as trophic changes (described at 38 C.F.R. § 4.104, DC 7115). Peripheral neuropathy which is wholly sensory is mild or, at most, moderate. With dull and intermittent pain in a typical nerve distribution, it is at most moderate. With no organic changes it is moderate or, if of the sciatic nerve, moderately severe. 38 C.F.R. § 4.20. Neuralgia of a peripheral nerve of a lower extremity can receive a maximum rating of moderate incomplete paralysis. 38 C.F.R. § 4.124. Neuritis characterized by loss of reflexes, muscle atrophy, sensory disturbances, and constant pain, at times excruciating, can receive a maximum rating of severe, incomplete paralysis. 38 C.F.R. § 4.123. 

Cervical Spine Rating Criteria

Note 2 to the General Rating Formula provides that normal forward flexion of the cervical spine is 0 to 45 degrees, extension is 0 to 45 degrees, left and right lateral flexion are 0 to 45 degrees, and right and left rotation are 0 to 80 degrees. The combined range of motion refers to the sum of these ranges of motion and the normal combined range of motion of the cervical spine is 340 degrees. The normal ranges of motion for each component of spinal motion are the maximum that can be used for calculation of the combined range of motion. 

A 10 percent rating is warranted when forward flexion of the cervical spine is greater than 30 degrees but not greater than 40 degrees, or the combined range of motion of the cervical spine is greater than 170 degrees but not greater than 335 degrees (the maximum combined range of motion being 340 degrees), or if there is either (1) muscle spasm, guarding, or localized tenderness not resulting in abnormal gait or abnormal spinal contour; or, (2) vertebral body fracture with loss of 50 percent or more of body height. 

A 20 percent rating is warranted when forward flexion of the cervical spine is greater than 15 degrees but not greater than 30 degrees or the combined range of motion of the cervical spine is not greater than 170 degrees (the maximum combined range of motion being 340 degrees), or if there is either (1) muscle spasm or guarding severe enough to result in abnormal gait or abnormal spinal contour, e.g., scoliosis, reversed lordosis, or abnormal kyphosis. 

A 30 percent rating is warranted when forward flexion of the cervical spine is to 15 degrees or less; or, there is favorable ankylosis of the entire cervical spine. A 40 percent rating is warranted when there is unfavorable ankylosis of the entire cervical spine. A 100 percent rating is warranted when there is unfavorable ankylosis of the entire spine. 

A higher initial rating for a lumbar spine disability, rated as 10 percent prior to September 13, 2013 and 20 percent thereafter

VAOPT records show that the Veteran underwent extensive physical therapy and even chiropractic treatment for his spine. VA X-rays in November 2009 revealed hypertrophic bridging lumbar osteophytes on the right at L2, L3, and L4, with degenerative changes at L4-5 and L5-S1. 

A July 1, 2010 VAOPT records shows that the Veteran complained of chronic low back pain. Lumbar lordosis was flat and his pain increased on forward bending and return from forward bending. 

At the June 24, 2013 hearing before a Decision Review Officer (DRO) the Veteran testified that he had injured his back during service when he had also injured his now service-connected right knee, and since then he had seen chiropractors, off and on, for his back, although he was now unable to locate those records. He had not had low back surgery but had had acupuncture and took pain medication. His back problems caused difficulty sleeping, standing, walking, and sitting for too long. 

On VA spinal examination on September 13, 2013, the Veteran's claim file was reviewed. It was reported that the Veteran used to have intermittent back pain, but for the past dozen years he has chronic daily low back pain, which was worse with prolonged standing, sitting, and walking. He had not had back surgery but he received intermittent chiropractic care, which helped. He used Tramadol for pain. He did not report having flare-ups that impacted function of the thoracolumbar spine. 

On physical examination the Veteran had thoracolumbar flexion to 50 degrees, with pain at that point. Extension was to 5 degrees, with pain at that point. Lateral bending, to the right and the left, as well as rotation to the right and left were painless to 10 degrees. These measurements were unchanged after three repetitions of motion, for a combined range of motion of 95 degrees. He had functional loss or impairment due to limited and painful motion. He had upper to mid lumbar vertebrae, mild paravertebral muscle tenderness but no muscle spasm or guarding. Strength was normal in ankle flexion and dorsiflexion as well as great toe extension but only 4/5 strength in hip flexion and knee extension, bilaterally. There was no muscle atrophy. Deep tendon reflexes were normal at both knees and ankles. Sensation was normal, bilaterally, at the upper anterior thighs, knees, lower legs, ankles, feet, and toes. Straight leg raising was negative, bilaterally. There was no radicular pain or other signs of radiculopathy, and he did not have intervertebral disc syndrome (IVDS). He regularly used a cane due to a combination of his back as well as both knees and left hip. 

X-rays had documented lumbar arthritis and disc space narrowing at L5-S1 consistent with a degenerative disc. As to an impact on his ability to work he was unable to perform bending, lifting, or prolonged standing. 

The Veteran walked with a steady gait wearing bilateral knee braces. He spent equal time on both feet during stance phase. There was no abnormal lateral component placing undo strain upon his spine. Also, his head and neck were held erect, as was his back) while he ambulated. This appeared to be the same gait displayed during an orthopedic examination January 15, 20113. An earlier examination of November 23, 2009 described only a "mild limp." In was the examiner's opinion, that it was less likely than not that his current lumbar DDD and his cervical DDD are caused by or aggravated by his service connected knees and left hip. 

In a January 2014 letter S. Cole, D.O., reported that the Veteran took medications for many disabilities, including thoracic spine disability. He received regular physical therapy, chiropractic care and pain, management services related to the above conditions. He had persistent pain in his back contributing to stress, depression and disordered sleep. In another statement in that month that physician stated that the Veteran described having had chronic back pain inhibiting his mobility since 1988. 

In a May 28, 2015 statement Dr. J. Keeney reported that the Veteran had had a left knee replacement on May 28, 2015, having previously had a right knee replacement in 2012. His condition had progressed over several years. The effect of the deterioration of his knees had had an adverse impact on the function of his hips and low back, and had exacerbated symptoms from these areas. It was expected that he would continue to have symptoms in these other areas. 

A July 13, 2015, report from the Veteran's VA Primary Care Physician reflects that he had been referred for Chiropractic and Spinal Pain Management epidurals and local neck shots. He had had many annual incapacitating episodes that have required him to seek VA and private spinal medical care. 

In a July 2015 statement the Veteran's wife reported that for over 20 years he had suffered from head to toe various types of chronic pain. He had had many appointments for chiropractic and spinal pain management epidurals, local neck shots and additional medical care. The service connected DDD of his cervical and lumbar spine had multiplied his medical conditions due to the lack of proper medical treatment as needed from 1991 to 2009. Private and VA doctors would verify he had had many annual incapacitating spinal episodes that had required him to seek VA and private spinal medical care once he is able to walk. His private treatment sources would verify that he had 2 -3 months of spinal episodes annually requiring spinal care, and which rendered him incapacitated requiring the support of his wife and then need for various medical treatments. 

An August 5, 2015 statement from Dr. H. Hantush, the Veteran's VA Primary Care physician reflects that the Veteran had been receiving VA Pain Management Care through the Chiropractic Office and now received epidural injections in his spine and neck. He had chronic joint and cervical pain that renders him immobile in the bed for 3 weeks to a month per episodes, various 4 - 6 times annually; during these attacks he reports some time he is not taking his medications daily as he should. Patient is continually receiving spinal epidural and local shots in his neck and chiropractic adjustments and acupuncture treatments.

On VA thoracolumbar examination on February 11, 2016, the Veteran's VA and private medical records were reviewed. It was reported that the Veteran's chronic low back pain limited movement, and that his back locked up. He received temporary relief by having epidural injections every 3 months. He reported that cold weather and certain movements precipitated flare-ups. He reported having functional loss or impairment due to his back locking up and sleep disturbance because he had to sleep on a hard surface, e.g., a floor. 

On physical examination thoracolumbar flexion was to 45 degrees, extension was to 10 degrees, right and left lateral bending were to 15 degrees, and rotation in each direction was to 20 degrees (for a total combined range of motion of 125 degrees). The examiner reported that the limited motion contributed to functional loss because of difficulty dressing and undressing the Veteran's lower body. There was pain in all planes of movement but no evidence of pain on weight-bearing. There was objective evidence of localized tenderness or pain on palpation of the mid to upper lumbar spine. He was able to perform repetitive use testing with at least three repetitions without additional loss of function or range of motion. The examiner was unable to state whether pain, weakness, fatigability or incoordination significantly limited functional ability with repeated use over a period of time or with flare-ups without mere speculation because the examination was not conducted after repeated use over time or during a flare-up. There was no muscle spasm or guarding but there was localized tenderness which did not result in abnormal gait or abnormal spinal contour. Strength in hip flexion, knee extension, and ankle plantar and dorsiflexion was normal, bilaterally, and there was no muscle atrophy. Deep tendon reflexes were normal, at 2+, at the knees and ankles. Sensation was intact throughout both lower extremities, and straight leg raising was negative, bilaterally. The examiner stated that there was no radiculopathy or ankylosis. There were no other neurologic abnormalities or findings related to a thoracolumbar spine, e.g., bowel or bladder problems. 

However, the examiner reported that the Veteran had intervertebral disc syndrome (IVDS) and that the Veteran had had episodes of acute signs and symptoms due to IVDS that required bed rest prescribed by a physician and treatment by a physician in the past 12 months, inasmuch as the Veteran reported that he was told by his physician to stay in bed until pain subsided, although there was no documentation of this. He regularly used braces and canes as ambulatory aids, although occasional locomotion by other methods might be possible. It was reported that an October 2014 imaging study, compared to a 2010 study, revealed moderate DDD predominantly at L4-4 and L5-S1. As to functional impact of the thoracolumbar disorder the examiner reported that the Veteran would be unable to engage in employment requiring repetitive bending, lifting or standing for extended period. 

On VA examination of the Veteran's knees on December 6, 2016 the Veteran reported that around Thanksgiving he had had a flare-up of his chronic lumbar back condition, and had stayed home for about one week and rested. 

On VA psychiatric examination on December 27, 2016 the Veteran reported that he spent about 4 months out of the year or slightly more than 4 in bed because of his lumbar and cervical problems that rendered him bed-ridden.


Analysis

A higher initial rating for a lumbar spine disability, rated as 10 percent prior to September 13, 2013

Initially, the Board will address potential entitlement to a higher rating based on incapacitating episodes of IVDS. 

In this regard, more than the Veteran's verbal assurance of incapacitating episodes of IVDS is required. Rather, there must be not only treatment but bed rest prescribed by a physician. Here, there is no evidence that the Veteran has ever been prescribed bed rest by a physician. 

In this regard, to the extent that physicians have commented that the Veteran has had incapacitating episodes of back pain, it has not been stated, or even suggested, that the Veteran had been prescribed bed rest by a physician. Rather, these comment as to the duration of "incapacitating episodes" could only have been based upon the clinical history related by the Veteran, together with an erroneous understanding of the requirement that incapacitating episodes must necessarily encompass bed rest prescribed by and treatment by a physician. Inasmuch as the Veteran had never been prescribed bed rest by a physician, he cannot have had "incapacitating episodes" within the meaning of the rating criteria in the Formula for Rating IVDS Based on Incapacitating episodes at 38 C.F.R. § 4.71a, Diagnostic Code 5243. Moreover, radicular symptoms in the Veteran's lower extremities have never been confirmed by any neurological evaluation. 

It necessarily follows that the appropriate ratings may be assigned only for the orthopedic manifestations, for combination with any appropriate and separate rating for neurologic manifestations. 

Prior to September 13, 2013, the Veteran is shown to have had painful motion which warrants the minimally compensable rating of 10 percent. However, he was not shown to have had thoracolumbar motion of greater than 30 degrees but not greater than 60 degrees, or a combined range of motion of the thoracolumbar spine is not greater than 120 degrees, or where there is muscle spasm or guarding severe enough to result in an abnormal gait or abnormal spinal contour such as scoliosis, reversed lordosis, or abnormal kyphosis. 

Thus, a higher rating than 10 percent for lumbar spine disability is not warranted prior to September 13, 2013. 

A higher initial rating for a lumbar spine disability, rated 20 percent since September 13, 2013

Since the September 13, 2013 VA rating examination the Veteran had not been shown to have limitation of thoracolumbar flexion of 30 degrees or less and he has not had any ankylosis of the thoracolumbar spine. In fact, a review of the entire evidentiary record makes is indisputable that the Veteran does retain some thoracolumbar motion and, so, this precludes finding that he had any thoracolumbar ankylosis. And again, radicular symptoms in the Veteran's lower extremities have never been confirmed by any neurological evaluation. 

Accordingly, the preponderance of the evidence is against finding that the Veteran met the schedular criteria for an orthopedic rating in excess of 20 percent since the September 13, 2013 VA rating examination. 

A higher initial rating for a cervical spine disability, rated as 10 percent prior to September 13, 2013 and 20 percent thereafter

VAOPT records show that the Veteran underwent extensive physical therapy and even chiropractic treatment for his spine. 

At the June 24, 2013 hearing before a Decision Review Officer (DRO) the Veteran testified that he started to have neck problems after he developed low back problems. He had been advised by a chiropractor that it was not uncommon for someone that has back problems to start having neck problems. He had not had cervical spine surgery but had had acupuncture and took pain medication. 

On VA spinal examination on September 13, 2013, the Veteran's claim file was reviewed. The Veteran stated he had had chronic daily neck pain for about the past 12 years. His neck pain was worse with certain head movements, looking up, etc. It was treated with chiropractic care. He used a TENS unit. He also used an inflatable neck unit that stretched his neck, about 1-2 times a month. He did not report having flare-ups that impacted function of the cervical spine. 

On physical examination cervical flexion was to 30 degrees without pain. Extension was to 15 degrees with pain beginning at that point. Right and left lateral bending were painless to 15 degrees. Rotation to the right was to 50 degrees and to the left to 40 degrees, with pain beginning at those points. For a combined range of motion of 165 degrees. After three repetitions of motion cervical flexion was to 20 degrees, but range of motion in all other planes remained the same. For a combined range of motion of 155 degrees. He had functional loss or impairment due to limited and painful motion. He had no localized tenderness, muscle spasm or guarding. Strength, reflexes, and sensations were normal throughout both upper extremities, and there was no muscle atrophy. He had no radicular pain and did not have cervical IVDS. 

X-rays had documented cervical arthritis with some disc space narrowing at C3-4. As to an impact on his ability to work he would have difficulty working above shoulder level due to neck pain. In was the examiner's opinion, that it was less likely than not that his current neck condition was caused by or aggravated by his service connected knees and left hip, and low back. It was noted that he held his head and neck up perfectly straight upon ambulation. 

In a January 2014 letter S. Cole, D.O., reported that the Veteran took medications for many disabilities, including cervical spine disability. He received regular physical therapy, chiropractic care and pain, management services related to the above conditions. He had persistent pain in his neck contributing to stress, depression and disordered sleep. 

A July 13, 2015, report from the Veteran's VA Primary Care Physician reflects that he had been referred for Chiropractic and Spinal Pain Management epidurals and local neck shots. He had had many annual incapacitating episodes that have required him to seek VA and private spinal medical care. 

In a July 2015 statement the Veteran's wife reported that for over 20 years he had suffered from head to toe various types of chronic pain. He had had many appointments for chiropractic and spinal pain management epidurals, local neck shots and additional medical care. The service connected DDD of his cervical and lumbar spine had multiplied his medical conditions due to the lack of proper medical treatment as needed from 1991 to 2009. Private and VA doctors would verify he had had many annual incapacitating spinal episodes that had required him to seek VA and private spinal medical care once he is able to walk. His private treatment sources would verify that he had 2 -3 months of spinal episodes annually requiring spinal care, and which rendered him incapacitated requiring the support of his wife and then need for various medical treatments. 

An August 5, 2015 statement from Dr. H. Hantush, the Veteran's VA Primary Care physician reflects that the Veteran had been receiving VA Pain Management Care through the Chiropractic Office and now received epidural injections in his spine and neck. He had chronic joint and cervical pain that renders him immobile in the bed for 3 weeks to a month per episodes, various 4 - 6 times annually; during these attacks he reports some time he is not taking his medications daily as he should. Patient is continually receiving spinal epidural and local shots in his neck and chiropractic adjustments and acupuncture treatments.

On VA cervical spine examination on February 11, 2016, the Veteran's VA and private medical records were reviewed. Reportedly, he had chronic neck pain which limited his ability to move his head at times. His neck became stiff to the point that he had to turn his body if he wanted to look at something. He received injections every three months but they were not as effective as they had been in the past. The Veteran was right handed. He reported that cold weather and certain movements precipitated flare-ups. As to functional loss or impairment the Veteran reported that he had sleep disturbance and that it was "impossible to move." 

On physical examination cervical flexion was to 30 degrees, extension was to 10 degrees, right lateral bending was to 15 degrees, left lateral bending was to 20 degrees, rotation to the right was to 55 degrees, and rotation to the left was to 45 degrees. He had pain in all planes of motion but it did not result in or cause functional loss. There was objective evidence of localized tenderness or pain on palpation of the lower cervical spine. There was no additional loss of function or range of motion after three repetitions of motion. The examiner was unable to state whether pain, weakness, fatigability or incoordination significantly limited functional ability with repeated use over a period of time or during flare-ups without resorting to speculation because the examination was not conducted over a period of time or during a flare-up. There was no muscle spasm or guarding but there was localized tenderness that did not result in an abnormal gait or abnormal spinal contour. Strength, deep tendon reflexes, and sensations in the upper extremities were normal and there was no muscle atrophy or ankylosis. 

The examiner reported that the Veteran had cervical IVDS but no episodes of acute signs and symptoms due to IVDS that required bed rest prescribed by a physician and treatment by a physician in the past 12 months. 

It was reported that an October 2014 imaging study, compared to a 2010 study, revealed multilevel disc herniations. As to the impact on the ability to work the examiner reported that the Veteran would not be able to engage in occupations requiring frequent changes in head position such as driving. 

On VA psychiatric examination on December 27, 2016 the Veteran reported that he spent about 4 months out of the year, or slightly more than 4, in bed because of his lumbar and cervical problems had rendered him bed-ridden.


Analysis

A higher initial rating for a cervical spine disability, rated as 10 percent prior to September 13, 2013 and 20 percent thereafter

Prior to September 13, 2013, the Veteran is shown to have had painful motion which warrants the minimally compensable rating of 10 percent. However, he was not shown to have had forward flexion of the cervical spine which is greater than 15 degrees but not greater than 30 degrees or a combined range of motion of not greater than 170 degrees (the maximum combined range of motion being 340 degrees), or either (1) muscle spasm or guarding severe enough to result in abnormal gait or abnormal spinal contour, e.g., scoliosis, reversed lordosis, or abnormal kyphosis. 

Thus, a higher rating than 10 percent for cervical spine disability is not warranted prior to September 13, 2013.

A higher initial rating for a cervical spine disability, rated 20 percent since September 13, 2013

Since the September 13, 2013 VA rating examination the Veteran had not been shown to have limitation of cervical flexion of 15 degrees or less and he has not had any ankylosis of the cervical spine. In fact, a review of the entire evidentiary record makes is indisputable that the Veteran does retain some cervical motion and, so, this precludes finding that he had any cervical ankylosis. Also, radicular symptoms in the Veteran's upper extremities have never been confirmed by any neurological evaluation. 

Accordingly, the preponderance of the evidence is against finding that the Veteran met the schedular criteria for an orthopedic rating in excess of 20 percent since the September 13, 2013 VA rating examination. 


An effective date for service connection for a lumbar spine disability and for a cervical spine disability prior to April 10, 2009

Generally, the effective date for a grant of service connection is the date of receipt of the claim or date entitlement arose, whichever is later. 38 U.S.C.A. § 5110(a) (West 2002); 38 C.F.R. §§ 3.400, 3.401. 

The effective date for an award of service connection based on an original claim generally "shall be fixed in accordance with the facts found, but shall not be earlier than the date of receipt of application therefor." 38 U.S.C. § 5110(a) (emphasis added); 38 C.F.R. § 3.400(b)(2)(i) (stating that the effective date for disability compensation is the "date of receipt of claim, or date entitlement arose, whichever is later"). As the Court has explained, "[t]he effective date of an award of service connection is not based on the date of the earliest medical evidence demonstrating a causal connection, but on the date that the application upon which service connection was eventually awarded was filed with VA." Lalonde v. West, 12 Vet. App. 377, 382 (1999). One exception to this general rule is where an application for disability compensation is received within one year from separation from active service; in this situation, the effective date of an award "shall be" the day following separation from active service. 38 U.S.C. § 5110(b)(1); 38 C.F.R. § 3.400(b)(2)(i).

The effective date for a grant of benefits on the basis of the receipt of new and material evidence received after final disallowance, or in the case of reopened claims, is the date of receipt of the new claim, or the date entitlement arose, whichever is later. 38 U.S.C. § 5110(a); 38 C.F.R. § 3.400(q)(1)(ii), (r). 

A specific claim in the form prescribed by VA must be filed in order for benefits to be paid or furnished to any individual under the laws administered by VA. 38 U.S.C. § 5101(a); 38 C.F.R. § 3.151(a). Any communication or action, indicating intent to apply for one or more benefits under the laws administered by VA, from a claimant, his duly-authorized representative, a Member of Congress, or some person acting as next friend of a claimant who is not sui juris, may be considered an informal claim. Such informal claim must identify the benefit sought. Upon receipt of an informal claim, if a formal claim has not been filed, an application form will be forwarded to the claimant for execution. If received within one year from the date it was sent to the claimant, it will be considered as filed as of the date of receipt of the informal claim. 38 C.F.R. § 3.155(a). 

As to an argument for an earlier effective date for granting service connection retroactive to the day after service discharge should be granted, when the initial claim was not received until years thereafter, because a veteran was not informed that he could file a claim for VA disability compensation, under the governing statutory and regulatory provisions, 38 U.S.C. §§ 5101, 5110; 38 C.F.R. § 3.400, the claim-filing date was the earliest permissible effective date for benefits. Rather, 38 U.S.C. § 5101(a) requires the filing of a claim before a veteran will receive benefits, and 38 U.S.C. § 5110(a) provides that "[u]nless specifically provided otherwise in this chapter, the effective date of an award based on an original claim ... of compensation ... shall be fixed in accordance with the facts found, but shall not be earlier than the date of receipt of application therefor." Id. § 5110(a) (emphasis added). The relevant implementing regulation states that unless the VA receives a claim within one year after a veteran's separation from service, the effective date for that veteran's receiving disability compensation is the "date of receipt of claim, or date entitlement arose, whichever is later." 38 C.F.R. § 3.400(b). (emphasis added). 

Analysis

On December 2, 1991 the Veteran filed VA Form 21-526, Application for Compensation, requesting service connection for residuals of a right knee injury. 

The Veteran's initial claim for service connection for disabilities of the cervical and lumbosacral spine, VA Form 21-526, was received on April 10, 2009. He alleged that he had had injuries of those areas in March 1977. 

During the interim between receipt of the December 2, 1991 claim for service connection for residuals of a right knee injury and the second VA Form 21-526 April 10, 2009, there was no communication from the Veteran or any service representative mentioning the Veteran's low back or his neck, i.e., cervical spine. 

Here, the effective date assigned for the Veteran's service-connected disabilities of the lumbar and cervical spinal segments has been set as of the date of receipt the original claims for service connection for those disabilities, i.e., receipt of VA Form 21-526, on April 10, 2009. 

In his earlier claim, received in 1991, the Veteran only claimed service connection for a right knee disability and there was no mention of disabilities of the lumbar and cervical spinal segments. The Board has carefully reviewed all communications during the interim and none contain any reference, much less express a belief in entitlement to compensation for disabilities of the lumbar and cervical spinal segments or even remotely suggest or imply an intent to claim service connection for such disabilities. 

To the extent that there might be any clinical records during the aforementioned interim, the United States Court of Appeals for Veterans Claims (Court) has held that where a claimant has not previously been granted service connection, VA's receipt of medical records cannot be construed as an informal claim. Lalonde v. West, 12 Vet. App. 377, 382 (1999). VA is not required to anticipate any potential claim for a particular benefit where no intention to raise it was expressed and the mere presence of medical evidence that a veteran suffers from a disability does not establish intent on the part of the veteran to seek service connection for that disability. Brannon v. West, 12 Vet. App. 32, 34 - 35 1998). Further, the Federal Circuit Court has held that the mere mention of a condition in a medical record, alone, cannot be construed as a claim for service connection. See MacPhee v. Nicholson, 459 F.3d 1323, 1327 (Fed.Cir. 2006); see also 38 C.F.R. §§ 3.155, 3.157. 

Similarly, as to any argument that the Veteran had disabilities of the lumbar and cervical spinal segments prior to the current effective date of April 10, 2009, as set out above, the relevant regulation requires that a claim, or at least some application that reasonably viewed can be considered a claim, be filed. Here, there was no such claim prior to April 10, 2009. 

The Board is aware of the statement received on November 24, 2009 from a service representative reflecting that the Veteran reported that his STRs would document that he injured his low back during basic training early in his military career. However, in this connection the Board notes several matters. First, this contention is not shown in the STRs. Second, even if the Board were to assume, as alleged, that the STRs are incomplete there remains the incontrovertible fact that he did not file a claim for service connection for a low back disability until April 10, 2009. 

Accordingly, as the preponderance of the evidence is against effective dates prior to April 10, 2009, for service connection for disabilities of the lumbar and cervical spinal segments, an earlier effective date is not warranted. 38 U.S.C. § 5107(b); 38 C.F.R. § 3.102; Gilbert v. Derwinski 1 Vet. App. 49 (1990). 

Whether the Veteran perfected a timely appeal from a May 2010 rating denying service connection for erectile dysfunction

The Veteran filed a claim on December 29, 2009 for service connection for erectile dysfunction, claimed as due to his service-connected lumbar spine or service-connected depressive disorder. He was notified by a June 1, 2010 RO letter of a May 2010 rating denying service connection for erectile dysfunction, to which he filed an NOD in May 2011 and, after a DRO hearing in June 2013, an SOC was issued on October 3, 2013 but his VA Form 9 was not received until January 27, 2014. 

The VA Form 9, Appeal to the Board, was received on January 27, 2014, more than one year after the June 1, 2010 notice of the RO denial of service connection for erectile dysfunction and more than 60 days after the issuance of the October 3, 2013 SOC. The Veteran was notified of this by RO letter of August 21, 2015. 

Appellate review of an RO decision is initiated by an NOD and completed by a substantive appeal, after an SOC is furnished. 38 U.S.C. § 7105(a); 38 C.F.R. § 20.200. On receipt of the NOD the RO takes such action or development as is appropriate, and if still denied an SOC is issued. 38 U.S.C. § 7105(d)(1). A substantive appeal must then be filed within 60 days of the date of mailing the SOC, 38 U.S.C.A. § 7105(d)(3), or within the remainder of the one-year period from the date of NOD notification, whichever periods ends later. 38 C.F.R. § 20.302(b). The substantive appeal consists of a properly completed VA Form 9, Appeal to the Board, or correspondence containing the necessary information. 38 C.F.R. § 20.202. The formal appeal is to present specific arguments relating to errors of law or fact on the part of the RO. 38 U.S.C. § 7105(d)(3); see Roy v. Brown, 5 Vet. App. 554, 555 (1993). 

The one year time limit for filing the formal appeal may be extended for good cause under 38 U.S.C.A. § 7105(d)(3) and 38 C.F.R. § 20.303. However, 38 C.F.R. § 20.303 (formerly 38 C.F.R. § 19.130(1990)) provides for extension of the 60 day period to file a substantive appeal or the 30 days period to respond to a SSOC for good cause if the request is in writing and received prior to the expiration of the time period for filing the substantive appeal. Roy v. Brown, 5 Vet. App. 554. 555 (1993). 

Here, after an SOC was issued on October 3, 2013, no communication, written or otherwise, was received from the Veteran until his VA Form 9 was received on January 27, 2014, which was more than three years after the June 2010 notification of the May 2010 rating decision and more than 60 days after the issuance of the SOC. Moreover, the Veteran did not request an extension of time within which to file a Substantive Appeal. 

Accordingly, the Veteran did not perfect a timely appeal from the May 2010 rating decision and that decision is final. In reaching this determination the facts are undisputed and, so, there is no doubt to be resolved. 38 U.S.C.A. § 5107(b); 38 C.F.R. § 3.102; Gilbert v. Derwinski 1 Vet. App. 49 (1990). 



ORDER

Service connection for coronary artery disease (CAD) and headaches is granted. 

Service connection for sleep apnea, a right leg disability, and a left leg disability is denied. 

A higher rating for a depressive disorder, rated 30 percent prior to September 20, 2013, and 50 percent thereafter is denied. 

A higher rating for a right ankle strain, rated 10 percent since September 20, 2013, is denied. 

A higher rating for PO residuals of a right knee replacement, rated 30 percent, is denied. 

A higher rating for a left knee disability, rated 10 percent prior to May 28, 2015, and 30 percent thereafter is denied. 

A higher initial rating for a lumbar spine disability, rated 10 percent prior to September 13, 2013 and 20 percent thereafter, is denied. 

A higher initial rating for a cervical spine disability, rated 10 percent prior to September 13, 2013 and 20 percent thereafter, is denied. 

An effective date for service connection for a lumbar spine disability and for cervical spine disability prior to April 10, 2009, is denied. 

The Veteran did not perfect a timely appeal from a May 2010 rating denying service connection for erectile dysfunction. 



REMAND

A higher rating for left hip disability rated 10 percent

On VA examination on January 15, 2013, after a physical examination, which did not record findings as to the left hip, it was opined that the left hip disability was due to the service-connected disabilities of the knees. As to the Veteran's left hip, he reported having the onset of left hip pain about 2 years ago. He stated that over the year he had continua1ly had to shift his weight from the painful right knee onto his left lower extremity. He stated that currently he had constant left hip pain, but no such symptoms in the right hip. He had had a steroidal intraarticular injection in his left hip in October 2011, which he stated had helped. A left hip X-ray in March 2011 had revealed mild degenerative changes of the left hip, and there were similar changes in the right hip. An MRI scan of the left hip was done without contrast and was described as being a normal MRI scan. 

The Veteran stated that his wife had to help him put on his socks, and he only wore slip-on shoes. He stated that using the cane in his right hand did help the left hip. He reported that he did not cross one leg over the other, since it was difficult for him because of tightness and pain, particularly in the left hip. His tolerance for activities was only 4 to 5 minutes of standing in one place, walking for half a block, and sitting for 15 to 20 minutes. His symptoms regarding the left hip were more related to activities, rather than having specific flare-ups. 

On physical examination flexion, abduction and external rotation of both hips caused mild pain, somewhat greater on the left than the right. He was unable to cross one leg over the other. The pelvis was level when standing with equal leg lengths. Flexion of both hips was to 100 degees, extension of both hips was to 10 degrees, abduction of both hips was to 40 degrees, adduction of both hips was to.20 degrees, internal rotation of both hips was to 30 degrees, and external rotation of the right hip was to 30 degrees and in the left hip to 40 degrees. There was 4/5 strength of hip musculature, bilaterally. There was no change in motion with repetition, but there was moderate pain, fatigability, weakness and lack of endurance of the left hip but not the right hip. There was no incoordination. The diagnosis was osteoarthritis of the left hip. It was opined that it was more likely than not that the Veteran's left hip condition was caused by a gait abnormality and altered gait.

A February 12, 2014 Disability Benefits Questionnaire (DBQ) report shows that the Veteran's claim file was reviewed and that as to the Veteran's left hip, he had degenerative arthritis of both hips. He had pain, in both hips but his left was much worse than the right. He thought his right leg is longer than his left leg. He did not recall a specific injury to his hips. The shifting of his weight due to knee injury had caused the problems with his hip pain by over compensating. He did not report that flare-ups impacted the function of the hip and/or thigh. 

On physical examination left hip flexion was to 115 degrees, with pain beginning at 110 degrees. Extension was to 5 degrees, with pain beginning at that point. Abduction was not lost beyond 10 degrees. Adduction was limited such that he could not cross his legs. Rotation was limited such that he could not toe-out more than 15 degrees. After repetitive use testing there were no changes in the degrees of range of motion. He had functional loss or impairment due to limited and painful movement, weakened movement, and incoordination and instability of station. There was no localized tenderness- or pain to palpation for joints/soft tissue of either hip. Strength in left hip flexion, extension, and abduction was 4/5. There was no malunion or nonunion of femur, flail hip joint or leg length discrepancy. He had not had a left hip replacement. He constantly used a cane and regularly used a walker. He used a cane most all the time to ambulate but used a walker to walk further distances. It was reported that his conditions of the hips did not impact his ability to work. 

In a May 28, 2015 statement Dr. J. Keeney reported that the Veteran had had a left knee replacement on May 28, 2015, having previously had a right knee replacement in 2012. His condition had progressed over several years. The effect of the deterioration of his knees had had an adverse impact on the function of his hips and low back, and had exacerbated symptoms from these areas. It was expected that he would continue to have symptoms in these other areas. 

An August 5, 2015 statement from Dr. H. Hantush, the Veteran's VA Primary Care physician reflects that as to the Veteran's left hip he had been receiving injections in the left hip for the last two years. It was hoped that his May 28, 2015, left knee replacement would assist in the corrective mobility of the hip condition. 

A July 29, 2016 statement from J. Keeney, M.D., of the University of Missouri School of Medicine reflects that X-rays of the Veteran's hips in May 2016 revealed a "cam-type" deformity of the femoral head but the articular space in both hips was reasonably well-maintained. 

On VA psychiatric examination of December 27, 2016 the Veteran reported that he planned to undergo a left hip replacement sometime next year. 

On VA examination in January 2017 the Veteran's records were reviewed. It was reported that the Veteran had degenerative arthritis of the left hip. He had pain, stiffness, and crepitance all of which increased with weight bearing, ambulation of greater than 1/2 block, and cold weather. Injections of medication had provided temporary relief. The Veteran was undergoing possible surgical intervention. 

On physical examination, actively and passively, left hip flexion was to 90 degrees (with normal being to 125 degrees), extension was to 20 degrees (with normal being to 30 degrees), abduction was to 35 degrees (with normal being to 45 degrees), and adduction was to 20 degrees (with normal being to 25 degrees). Adduction was limited such that the Veteran could not cross his legs. External rotation was to 20 degrees (with normal being to 60 degrees) and internal rotation was to 15 degrees (with normal being to 40 degrees). His limited motion and his pain in all planes of motion contributed to functional loss. There was evidence of pain on weight bearing and tenderness on direct pressure of the greater trochanter. There was no additional loss of function or range of motion after three repetitions of motion. Pain, fatigue, and lack of endurance caused functional loss with repeated use and significantly limited functional ability with flare-ups. Left hip strength was normal and there was no atrophy. There was no malunion or nonunion of the femur, flail hip joint or leg length discrepancy. He regularly used a cane as an ambulatory aid. With respect to occupational impairment activities requiring prolonged weight bearing or ambulation would be difficult. The examiner commented that left hip DJD was well documented and was more likely than not the result of mechanical and gait stresses applied to the left hip from his service-connected disorders of the knees. 

However, since the most recent VA rating examination, in January 2017, the Veteran was hospitalized on the 29th and 30th of August 2017 at the Health Care- University Hospital during which time he had a total left hip replacement. 

The Veteran has not been afforded a VA rating examination since he had his total left hip replacement and, in the opinion of the Board, such an examination would be helpful in adjudicating the claim for an increased rating for the service-connected left hip disability. 

Accordingly, the case is REMANDED for the following action:

(Please note, this appeal has been advanced on the Board's docket pursuant to 38 C.F.R. § 20.900(c). Expedited handling is requested.)

1. Afforded the Veteran an examination of his left hip for rating purposes. Access to the electronic claims file should be made available to the examiner. All indicated tests should be accomplished, and the findings detailed.

The examination should include range of motion testing in flexion, extension, abduction, adduction and rotation. 

The examiner should test the range of motion (using a goniometer) in active motion, passive motion, weight-bearing, and nonweight-bearing, for both the joint in question and any paired joint in accordance with Correia v. McDonald, 28 Vet. App. 158 (2016). If the examiner is unable to conduct the required testing or concludes that the required testing is not necessary in this case, he or she should clearly explain why that is so. 

During range of motion testing, the examiner should provide commentary regarding symptoms including painful motion, functional loss due to pain, excess fatigability, weakness, and additional disability during flare-ups. Any additional loss of motion with repetitive movement should be noted. The examiner should inquire as to periods of flare-up, and note the frequency and duration of any such flare-ups, and the functional losses imposed. 

The examiner should express an opinion regarding the postoperative residuals of the left hip replacement, as set forth at 38 C.F.R. § 4.71a, Diagnostic Code 5054. Specifically, the examiner is request to opinion whether there are (a) moderately severe residuals of weakness, pain or limitation of motion; or (b) markedly severe residual weakness, pain or limitation of motion; or (c) painful motion or weakness such as to require the use of crutches. 

A complete rationale for any opinions expressed should be provided. 

2. Thereafter, the RO should readjudicate the claim. If the claim remains denied the Veteran and any representative, if any, should be provided a Supplemental Statement of the Case (SSOC) and afforded the appropriate period of time within which to respond, at the Veteran's option. Thereafter, return the case to the Board for further appellate consideration. 

The appellant has the right to submit additional evidence and argument on the matter or matters the Board has remanded. Kutscherousky v. West, 12 Vet. App. 369 (1999).





This claim must be afforded expeditious treatment. The law requires that all claims that are remanded by the Board of Veterans' Appeals or by the United States Court of Appeals for Veterans Claims for additional development or other appropriate action must be handled in an expeditious manner. See 38 U.S.C.A. §§ 5109B, 7112 (West 2014).




______________________________________________
DEBORAH W. SINGLETON
Veterans Law Judge, Board of Veterans' Appeals


Department of Veterans Affairs